UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIANNE S. FREUDIGER, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>MOLECULAR PARTNERS AG, PATRICK AMSTUTZ, ANDREAS EMMENEGGER, WILLIAM M. BURNS, AGNETE FREDRIKSEN, STEVEN H. HOLTZMAN, SANDIP KAPADIA, VITO J. PALOMBELLA, MICHAEL VASCONCELLES, and DOMINK HÖCHLI,<br><br>                              Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Marianne S. Freudiger ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Molecular Partners AG ("Molecular Partners" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Molecular Partners American Depositary Shares ("ADSs") pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about June 16, 2021 (the "IPO"); and/or (b) Molecular Partners securities between June 16, 2021 and April 26, 2022, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Molecular Partners operates as a clinical-stage biopharmaceutical company that focuses on the discovery, development, and commercialization of therapeutic proteins.  Leading up to and following the IPO, the Company repeatedly touted the clinical and commercial prospects of certain of its product candidates under development in collaboration with other companies.

3.     Among other product candidates, Molecular Partners is developing ensovibep as a treatment for COVID-19 in collaboration with Novartis AG ("Novartis").  One of the Company's most important development strategies for ensovibep includes securing Emergency Use Authorization ("EUA") for ensovibep from the U.S. Food and Drug Administration ("FDA").

4.     In addition, Molecular Partners is developing MP0310 (AMG 506) for the treatment of certain types of cancer in collaboration with Amgen Inc. ("Amgen").  The Company granted Amgen, among other licenses, the right to progress MP0310's development program into later stage development, including into combination trials, following Phase 1 data.

5.      On April 22, 2021, Molecular Partners filed a registration statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on June 15, 2021 (the "Registration Statement").

6.      On June 16, 2021, Molecular Partners filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").

7.      Pursuant to the Offering Documents, Molecular Partners conducted the IPO, issuing 3 million of its ADSs to the public at the IPO price $21.25 per ADS, for proceeds to the Company of over $59 million, after underwriting discounts and commissions, and before expenses.

8.      The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) ensovibep was less effective at treating COVID-19 than Defendants had led investors to believe; (ii) accordingly, the FDA was reasonably likely to require an additional Phase 3 study of ensovibep before granting the drug EUA; (iii)  waning global rates of COVID-19 significantly reduced the Company's chances of securing EUA for ensovibep; (iv) as a product candidate, MP0310 was less attractive to Amgen than Defendants had led investors to believe; (v) accordingly, there was a significant likelihood that Amgen would return global rights of MP0310 to Molecular Partners; (vi) as a result of all the foregoing, the clinical and commercial prospects of ensovibep and MP0310 were overstated; and (vii) as a result, the Offering

Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

9.      On November 16, 2021, Molecular Partners disclosed that "a planned futility analysis of ensovibep in [an] ongoing [Phase 3] clinical study . . . has not met the thresholds required to continue enrollment of adults with COVID-19 in the hospitalized setting."

10.     On this news, Molecular Partners' ADS price fell $4.64 per ADS, or 31.37%, to close at $10.15 per ADS on November 16, 2021.

11.     On April 26, 2022, months after applying for EUA from the FDA for ensovibep, Novartis' Chief Executive Officer ("CEO"), Vas Narasimhan ("Narasimhan"), disclosed that "given the latest feedback . . . in our discussions with the [FDA], we would expect the agency to require a Phase 3 study before granting an EUA approval or a general approval" for ensovibep, and that "we need to make a kind of sober evaluation as to is it a doable study in light of the waning rates of COVID around the world[.]"

12.     On this news, Molecular Partners' ADS price fell $2.68 per ADS, or 16.17%, to close at $13.89 per ADS on April 26, 2022.

13.     Then, also on April 26, 2022, during after-market hours, Molecular Partners "announced that Amgen . . . has informed the Company of their decision to return global rights of MP0310 to Molecular Partners following a strategic pipeline review."

14.     On this news, Molecular Partners' ADS price fell $5.19 per ADS, or 37.37%, to close at $8.70 per ADS on April 27, 2022—a total decline of $7.87 per ADS, or 47.5%, over two consecutive trading days, and 59.06% below the $21.25 per ADS IPO price.

15.     As of the time this Complaint was filed, the price of Molecular Partners' ADSs continues to trade below the $21.25 per ADS IPO price, damaging investors.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Molecular Partners' ADSs trade on the Nasdaq Stock Market ("NASDAQ") located in this Judicial District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21.     Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired Molecular Partners ADSs pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or Molecular Partners ADSs during the Class Period, and suffered

damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Defendant Molecular Partners is organized under the laws of Switzerland with principal executive offices located at Wagistrasse 14, 8952 Zürich-Schlieren, Switzerland.  The Company's ADSs trade in an efficient market on the NASDAQ under the trading symbol "MOLN".

23.     Defendant Patrick Amstutz ("Amstutz") has served as Molecular Partners' CEO and a Director of the Company at all relevant times.  Amstutz signed or authorized the signing of the Registration Statement filed with the SEC.

24.     Defendant Andreas Emmenegger ("Emmenegger") has served as Molecular Partners' Chief Financial Officer at all relevant times.  Emmenegger signed or authorized the signing of the Registration Statement filed with the SEC.

25.     Defendants Amstutz and Emmenegger are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

26.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Molecular Partners' SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Molecular Partners' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Molecular Partners, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially

false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

27.     Molecular Partners and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

28.     Defendant William M. Burns ("Burns") has served as Molecular Partners' Chairman of the Board of Directors at all relevant times.  Burns signed or authorized the signing of the Registration Statement filed with the SEC.

29.     Defendant Agnete Fredriksen ("Fredriksen") has served as a Director of Molecular Partners at all relevant times.  Fredriksen signed or authorized the signing of the Registration Statement filed with the SEC.

30.     Defendant Steven H. Holtzman ("Holtzman") has served as a Director of Molecular Partners at all relevant times.  Holtzman signed or authorized the signing of the Registration Statement filed with the SEC.

31.     Defendant Sandip Kapadia ("Kapadia") has served as a Director of Molecular Partners at all relevant times.  Kapadia signed or authorized the signing of the Registration Statement filed with the SEC.

32.     Defendant Vito J. Palombella ("Palombella") has served as a Director of Molecular Partners at all relevant times.  Palombella signed or authorized the signing of the Registration Statement filed with the SEC.

33.     Defendant Michael Vasconcelles ("Vasconcelles") has served as a Director of Molecular Partners at all relevant times.  Vasconcelles signed or authorized the signing of the Registration Statement filed with the SEC.

34.     Defendant Domink Höchli ("Höchli") has served as a Director of Molecular Partners at all relevant times.  Höchli signed or authorized the signing of the Registration Statement filed with the SEC.

35.     The Exchange Act Individual Defendants and Defendants Burns, Fredriksen, Holtzman, Kapadia, Palombella, Vasconcelles, and Höchli are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

36.     As directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Molecular Partners' ADSs in the IPO for their own benefit and the benefit of the Company.  The Securities Act Individual Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase the shares sold in the IPO.

37.     Molecular Partners and the Securities Act Individual Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

38.     The Exchange Act Defendants and the Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

39.     Molecular Partners operates as a clinical-stage biopharmaceutical company that focuses on the discovery, development, and commercialization of therapeutic proteins.  Leading up to and following the IPO, the Company repeatedly touted the clinical and commercial prospects of certain of its product candidates under development in collaboration with other companies.

40.     Among other product candidates, Molecular Partners is developing ensovibep as a treatment for COVID-19 in collaboration with Novartis.  One of the Company's most important development strategies for ensovibep includes securing EUA for ensovibep from the FDA.

41.     In addition, Molecular Partners is developing MP0310 (AMG 506) for the treatment of certain types of cancer in collaboration with Amgen.  The Company granted Amgen, among other licenses, the right to progress MP0310's development program into later stage development, including into combination trials, following Phase 1 data.

42.     On April 22, 2021, Molecular Partners filed the Registration Statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on June 15, 2021.

43.     On June 16, 2021, Molecular Partners filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

44.     Pursuant to the Offering Documents, Molecular Partners conducted the IPO, issuing 3 million of its ADSs to the public at the IPO price $21.25 per ADS, for proceeds to the Company of over $59 million, after underwriting discounts and commissions, and before expenses.

**Materially False and Misleading Statements Issued in the Offering Documents**

45.     With respect to ensovibep's clinical development and commercial prospects, the Offering Documents stated, in relevant part:

> [Ensovibep is] designed to have strong binding and neutralizing potencies targeting multiple epitopes on the SARS-CoV-2 spike protein that are crucial for infection. A Phase 2/3 clinical trial for ensovibep, the lead product candidate in our infectious disease program, initiated enrollment in May 2021, with interim data expected in August 2021 and full data expected in 2022. We are presently enrolling up to 40 patients in a Phase 2 study for ensovibep in the Netherlands, which was initiated in March 2021 . . . . [W]e have partnered with Novartis to develop, manufacture and commercialize ensovibep and MP0423, which we believe will allow us to develop

this product candidate as a therapeutic for the treatment of COVID-19. Our clinical development strategy aims to achieve potential [EUA] for ensovibep.

46.     The Offering Documents also stated that "[d]epending on the evolution of the global COVID-19 pandemic, we believe that ensovibep has the potential to be granted [EUA] from regulatory authorities" while downplaying the impact of waning rates of COVID-19, stating, in relevant part:

> While the developed world is moving quickly toward vaccinating a large part of its population, we believe there is still a significant need for therapeutics such as our COVID-19 antiviral therapeutic product candidates, since there are both many parts of the world that have not been able to obtain vaccines due to lack of funding and/or delivery issues and many people who cannot or will not get vaccinated. As our therapeutic product candidates are relatively inexpensive to produce and easy to deliver, we believe they can serve as a solution to specifically treat and stop the spread of the disease in under-vaccinated areas. Furthermore, even in areas where there are very high percentages of vaccinated population, there will continue to be a need for efficacious and easily administrated antiviral therapies.

> Preclinical potency data suggests that our DARPin product candidates [including ensovibep] may be administrable as a rapid infusion, or potentially as a subcutaneous injection, which would be a significant advantage for ease of delivery. Once an acceptable dose is identified from Part A of the EMPATHY trial, which initiated enrollment in May 2021, clinical work can begin to optimize a subcutaneous dose formulation for ensovibep. We believe that the greatest potential for ensovibep will be its administration in the community care setting. While vaccines against SARS-CoV-2 continue to emerge, the need for an efficacious and easily administered antiviral will be key to the patients who still contract this virus. To that end, we believe a subcutaneous, potent antiviral will be a key component to the treatment paradigm.

47.     The Offering Documents also expressed confidence in Molecular Partner's collaboration with Amgen for MP0310, stating, in relevant part, that "[w]e believe our partnership with Amgen allows for a meaningful investigation of combination therapies, given Amgen's expertise in the field of oncology"; that "[w]e expect that the ongoing Phase 1 clinical trial of AMG 506 (MP0310), should it demonstrate sustained activity of 4-1BB, will produce data in 2021 to inform potential combination studies which would be conducted by Amgen assets"; and that

"[w]e believe AMG 506 (MP0310) could be particularly relevant as a combination agent with potential combination studies in collaboration with Amgen."

48.     With further respect to the collaboration agreement between Molecular Partners and Amgen, the Offering Documents stated, in relevant part:

> Under the Amgen Agreement, we and Amgen will jointly evaluate MP0310 / AMG 506 in combination with Amgen's oncology pipeline products, including its investigational BiTE molecules. In accordance with a mutually agreed development plan, we will conduct the Phase 1a clinical trials and Amgen will be responsible for all subsequent development of MP0310 / AMG 506 after completion of the Phase 1a clinical trials. We and Amgen have established a joint steering committee to oversee the research, information sharing, and potential amendments of the research plan. Each party is responsible for development costs incurred by it until the beginning of Phase 2 clinical trial, after which point the parties will each contribute a fixed percentage of the development costs on the first three indications. Amgen is required to use commercially reasonable efforts to develop MP0310 / AMG 506 in combination with at least one of Amgen's oncology pipeline products in certain major markets.

49.     With respect to the potential termination of Molecular Partners' collaboration agreement with Amgen, the Offering Documents stated, in relevant part:

> The Amgen Agreement expires on a country-by-country basis upon the expiration of Amgen's payment obligations in such country. Amgen may terminate the Amgen Agreement in its entirety for convenience following a certain notice period. Either party may terminate the Amgen Agreement upon an uncured material breach of the agreement or insolvency of the other party following a certain notice period. Following any termination, we have certain rights to receive a license to certain intellectual property generated by Amgen under the Amgen Agreement for purposes of continued development and commercialization of MP0310 / AMG 506.

50.     The statements referenced in ¶¶ 45-49 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) ensovibep was less effective at treating COVID-19 than Defendants had led

investors to believe; (ii) waning global rates of COVID-19 significantly reduced the Company's chances of securing EUA for ensovibep; (iii) as a product candidate, MP0310 was less attractive to Amgen than Defendants had led investors to believe; (iv) accordingly, there was a significant likelihood that Amgen would return global rights of MP0310 to Molecular Partners; (v) as a result of all the foregoing, the clinical and commercial prospects of ensovibep and MP0310 were overstated; and (vi) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

### Materially False and Misleading Statements Issued During the Class Period

51.     The Class Period begins on June 16, 2021, when Molecular Partners' ADSs began publicly trading on the NASDAQ pursuant to the materially false and misleading statements or omissions contained in the Offering Documents.

52.     On July 8, 2021, Molecular Partners issued a press release announcing continued progress on ensovibep's clinical development, stating, in relevant part:

> [E]nsovibep continues to be evaluated for its potency and inhibition against all emerging and established variants of concern. These evaluations are conducted across multiple laboratories, including the NIH. In vitro data to date show that ensovibep retains full potency and viral inhibition against all known SARS-CoV-2 variants in circulation, including the key Delta variants containing the T478K and K417N mutations, presently a particular concern as it may be associated with higher infectivity rates, even in individuals who are vaccinated.

53.     The same July 8, 2021 press release also quoted Defendant Amstutz, who represented, in relevant part:

> The need for antiviral treatment that is active against all viral variants emerging globally continues to be critical, especially in a context of mixed vaccination rates . . . . We continue to be encouraged by the in vitro data seen for ensovibep against all known viral variants of concern. As we and Novartis continue to open additional clinical sites in multiple countries, data such as these suggest we can offer a truly differentiated solution to patients in need.

54.     On August 26, 2021, Molecular Partners issued a press release announcing the Company's corporate highlights and key financials for the first half of fiscal year 2021, stating, *inter alia*, that "[f]ollowing the positive initial results of MP0310, clinical work advanced into weekly administration of MP0310 in the Phase 1 study, to identify a dosing regimen to obtain sustained 4-1bb activation[,]" and that "Molecular Partners expects to obtain data from this trial within 2021, allowing for its partner, Amgen, to evaluate potential future development of MP0310 in combination with Amgen's oncology assets, including BiTE® molecules."

55.     The same August 26, 2021 press release also stated, in relevant part, that "[t]hus far, ensovibep has provided positive Phase 1 data and continued to maintain potency in laboratory studies against all known COVID-19 variants of concern."

56.     The statements referenced in ¶¶ 52-55 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) ensovibep was less effective at treating COVID-19 than Defendants had led investors to believe; (ii) waning global rates of COVID-19 significantly reduced the Company's chances of securing EUA for ensovibep; (iii) as a product candidate, MP0310 was less attractive to Amgen than Defendants had led investors to believe; (iv) accordingly, there was a significant likelihood that Amgen would return global rights of MP0310 to Molecular Partners; (v) as a result of all the foregoing, the clinical and commercial prospects of ensovibep and MP0310 were overstated; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

57.     On November 16, 2021, during pre-market hours, Molecular Partners issued a press release announcing that ensovibep had failed to meet thresholds for a futility analysis in ACTIV-3, a Phase 3 trial of ensovibep in treating COVID-19.  That press release stated, in relevant part:

> [A] planned futility analysis of ensovibep in the ongoing ACTIV-3 clinical study . . . has not met the thresholds required to continue enrollment of adults with COVID-19 in the hospitalized setting. This global Phase 3 ACTIV-3 platform study is being conducted by the National Institutes of Health (NIH) as part of its Accelerating COVID-19 Therapeutic Interventions and Vaccines (ACTIV) program. ACTIV is evaluating multiple therapies for COVID-19 to see what, if any, benefit can be seen over current standard of care. At the time of the analysis, 470 patients had been randomized in the ensovibep arm of the study. Ensovibep was observed to be generally safe and well tolerated with reported side effects consistent with standard of care.

58.     The same November 16, 2021 press release also quoted Defendant Amstutz, who stated, in relevant part, that "[d]emonstrating efficacy in hospitalized patients with COVID-19 has proven particularly challenging for antiviral therapies, with most investigational agents tested so far in the ACTIV-3 study not passing futility criteria – potentially due to the multi-systemic inflammatory component of late-stage COVID-19 disease."

59.     On this news, Molecular Partners' ADS price fell $4.64 per ADS, or 31.37%, to close at $10.15 per ADS on November 16, 2021.  Despite this decline in the Company's ADS price, Molecular Partners' securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the true clinical and commercial prospects of both ensovibep and MP0310.

60.     For example, the same November 16, 2021 press release assured investors that, despite the failed futility analysis of ensovibep in the ACTIV-3 clinical study:

> Molecular Partners and Novartis are collaborating on the development of ensovibep and are evaluating it in another global late-stage study, EMPATHY, which is designed to assess ensovibep's ability to rapidly reduce viral load and prevent

14

worsening of symptoms and hospitalization of patients who are in the early stages of disease. Novartis is conducting EMPATHY with Molecular Partners as sponsor, with topline interim data for the first 400 patients expected in early 2022.

Ensovibep is the lead therapeutic candidate in Molecular Partners' infectious disease pipeline. As a DARPin therapeutic candidate, it is designed to target SARS-CoV-2's spike protein at three sites to limit viral escape via mutation. In vitro data to-date demonstrate that ensovibep retains potency in inhibiting all known SARS-CoV-2 variants of concern, including the Delta variants. Molecular Partners has also initiated assessment of ensovibep when administered subcutaneously to complement the global registrational studies presently underway using administration via infusion.

61.    Additionally, in the same November 16, 2021 press release, Defendant Amstutz represented, in relevant part, that "Ensovibep's unique mechanism has the potential to meaningfully expand the medical toolkit in our collective fight against the ongoing pandemic, particularly in the face of global under-vaccination and the threat posed by continual new viral strains where we continue to retain potency."

62.    On November 30, 2021, Molecular Partners issued a press release announcing that "[e]nsovibep retains activity with regard to all relevant individual positions mutated in Omicron, the newly discovered viral variant of concern[.]"  That press release further stated, in relevant part:

[E]nsovibep has been consistently tested in vitro against all existing and potential variants of concerns. To date, ensovibep has maintained activity in vitro against all variants of concern detected, including the Delta strain2. Testing has been initiated in order to confirm the potency of ensovibep against the full Omicron pseudotype virus that comprises all mutations simultaneously.

Tri-specific Cooperative Binding Mechanism, designed to prevent loss of potency:

By the merits of its design, ensovibep contains three individual DARPin domains which are highly neutralizing to SARS-Cov-2. When constructed into a single molecule, ensovibep protects against mutational burden through a process known as cooperative binding . . . . This . . . allows ensovibep to efficiently protect against a multitude of variants.

63.    On January 10, 2022, Molecular Partners issued a press release announcing positive results from Part A of the Phase 2 EMPATHY clinical trial of ensovibep in patients with COVID-

19, stating, *inter alia*, that "Novartis confirms it will now exercise its option to in-license ensovibep from Molecular Partners and . . . will seek expedited access globally, first via the FDA's EUA process[,]" and that "[g]iven the pressing public health emergency and the rapid spread of the Omicron variant across the world, Novartis and Molecular Partners are in close liaison with regulatory bodies to seek expedited review and approval of ensovibep as soon as possible."

64.     On February 10, 2022, Molecular Partners issued a press release announcing that Novartis had submitted an EUA request to the FDA for ensovibep, stating, in relevant part, that "[t]his submission is based on the totality of the data from clinical and preclinical studies including the positive results of the Phase 2 portion of the EMPATHY study, a randomized, placebo-controlled study which enrolled 407 symptomatic patients infected with SARS-Cov-2."

65.     On March 15, 2022, Molecular Partners filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 20-F").  That filing stated, among other things, that "[w]e will assist Novartis as requested to support an expedited regulatory review process for ensovibep, first via the U.S. FDA's EUA process[,]" and that "[a] phase 3 clinical trial is expected to be initiated in parallel with expedited submissions to global regulatory bodies, which will be led by Novartis."

66.     The 2021 20-F also purported to warn of the impact on the successful commercialization of ensovibep in the event of a decline in COVID-19 cases, stating, in relevant part:

> [A] decline, or a widespread perception of a decline, in the spread or severity of the ongoing COVID-19 pandemic, or an increase in available alternative treatments for or widespread immunity to SARS-CoV-2, could reduce the total addressable market for our COVID-19 antiviral product candidates. As a result, our partner Novartis may not be able to successfully commercialize our COVID-19 antiviral product candidates for the treatment of COVID-19, even if approved, or compete with other treatments or vaccines, which could potentially reduce payments to us under our collaboration agreement and adversely impact our business and

operations. Moreover, if and as the pandemic transitions to an endemic phase, the public health emergency declarations underlying emergency use authorization may cease and require that sponsors seek full approval of COVID-19 treatments, which could adversely impact the development timeline for our partner Novartis.

Plainly, the foregoing risk warning was a generic, boilerplate provision that was not tailored to Molecular Partners' actual known risks regarding the likelihood that the FDA would require an additional Phase 3 study of ensovibep for the treatment of COVID-19 to support an EUA, much less that Novartis might not conduct a Phase 3 study of ensovibep for the treatment of COVID-19 because of waning rates of COVID-19 around the world.

67.     Additionally, the 2021 20-F contained substantively the same statements as referenced in ¶¶ 47-49, *supra*, expressing confidence in Molecular Partner's collaboration with Amgen for MP0310, and regarding the terms and potential termination of the collaboration agreement with Amgen.

68.     Appended as an exhibit to the 2021 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2022, wherein the Exchange Act Individual Defendants certified that "[t]he [2021 20-F] fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act" and that "[t]he information contained in the [2021 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

69.     Also on March 15, 2022, Molecular Partners issued a press release announcing the Company's fourth quarter and full year 2021 results, stating, *inter alia*:

> Results from [EMPATHY Part A study of ensovibep for acute COVID-19 ambulatory patients] showed that the primary endpoint was met with a statistically significant reduction in viral load over eight days, compared to placebo. The secondary endpoint of ER visits, hospitalization or death related to COVID-19 showed an overall 78% reduction in risk of events across ensovibep arms compared to placebo. Ensovibep also demonstrated a clinically meaningful time to sustained recovery benefit over placebo.

* * *

These data are part of a submission to the [FDA] for [EUA], which was announced in February 2022.

70.     On March 16, 2022, Molecular Partners held a conference call with investors and analysts to discuss the Company's fourth quarter and full year 2021 results.  On that call, in response to an analyst question regarding "any insight, any help you can give us on timing or progress of th[e EUA] process" for ensovibep, Defendant Amstutz stated, in relevant part, that the EUA process is "in the hands of Novartis, and it is an active process, and they are working very closely with the agency on this" and that, "from what we hear, this discussion is going well, and there is real interest, I guess, from the agency to dig into this."

71.     On the same call, in response to a question from a different analyst regarding "what additional data might be required from regulatory agencies ahead of receiving EUA approval[,]" whether "you expect anything kind of like clinical that the agency would need[,]" and "if you plan to submit additional follow-up data showing efficacy against Omicron[,]" Defendant Amstutz stated, in relevant part:

> [W]e could show the agency or Novartis can show the agencies all additional data from Part A as Part B is not going on. And so, I think that is just safety data after day 29. There is just more there is efficacy data, so call it maybe long COVID data that might be showing up there. So those are the data pieces that Novartis is collecting, but also additional data that we didn't have then. For sure, I mean, the sample of 400 patients that is not the largest trial. So we definitely are looking forward when we can start Part B and gather just more data in patients with ensovibep moving forward, especially as also Richard was pointing out, to be to go into a subcu formulation that would definitely be the best for application. So I think that the subcu is an important part, but that's not linked to the EUA.
>
> You were also asking about Omicron. So that data is all preclinical. And from what we know and also how the agency has seen that the preclinical data, so live-virus but [indiscernible] virus data is good enough to expand the label for the variants. So this was also done for a Lilly antibody that did show positive effects in specific settings, but not on Omicron patients, but in vitro on Omicron. So we believe our data that we have from the lab is strong enough to cover also for the clinical setting. And then, hopefully, that's also for future variants that could come from Omicron.

72.     On the same call, Defendant Amstutz also repeatedly downplayed the impact that waning rates of COVID-19 would have on ensovibep's clinical and commercial prospects, stating, for example:

> I heard [Omicron] is now paired with Deltacron and who knows what the next variants will be. I think there just a word of caution to all of us. I mean I remember a year ago, everybody said that wave is over, your product is not needed. And we feel a bit the same this year, we sort of predicted that. People will say you don't need it. Now it's over. But I do think next fall will be here a new variant will come.

* * *

> [There is] a clear need to be creative to get an [EUA] for a molecule that can be actually saving many lives if the next variant comes. And I think that's exactly where we position ourselves . . . . I do think we are hopefully hitting endemic and just meaning that the cases don't rise, but endemic it can be at a very high number and also new variants can at any point come, and just to remind you, new variants come from old variants. And the more virus load is out there in the globe, the higher the probability of a new variant coming up. So, I think we are at the highest risk ever for the next variant. We also now know that variants can break through vaccines. So, that's definitely not a good thing. So, I personally am very glad that we have ensovibep ready for whatever to come.

73.     With respect to Molecular Partners' collaboration agreement with Amgen for MP0310, Defendant Amstutz stated, in relevant part, that "we will expect to have more data on the weekly dosing [for MP0310] that we then share with Amgen that they can review and we should then have a decision mid of this year, how that program can, and if, move on[,]" and that "[f]or [MP0]310," which is part of "the T cell world[,]" the Company is "partnered with Amgen as they have a lot of T cell engagers and that combination makes sense."

74.     On the same call, Defendant Amstutz also assured investors, *inter alia*, that Defendants "ha[d] secured the funding into [20]25," is "in a very good position to execute on our plan," and that "excludes, and that's important, any potential further payments from existing or new partnerships, including the potential 22% royalties on ensovibep sales as well as potential milestone payments from Amgen[.]"

19

75.     The statements referenced in ¶¶ 60-74 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) ensovibep was less effective at treating COVID-19 than Defendants had led investors to believe; (ii) accordingly, the FDA was reasonably likely to require an additional Phase 3 study of ensovibep before granting the drug EUA; (iii) waning global rates of COVID-19 significantly reduced the Company's chances of securing EUA for ensovibep; (iv) as a product candidate, MP0310 was less attractive to Amgen than Defendants had led investors to believe; (v) accordingly, there was a significant likelihood that Amgen would return global rights of MP0310 to Molecular Partners; (vi) as a result of all the foregoing, the clinical and commercial prospects of ensovibep and MP0310 were overstated; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

76.     On April 26, 2022, Novartis held a conference call with investors and analysts to discuss its first quarter 2022 results.  On that call, in response to an analyst's request for an update on ensovibep and its future development, Novartis' CEO Narasimhan stated, in relevant pat:

> [W]e filed the EUA, and the EUA remains open with the FDA. However, at this point, given the latest feedback that in our discussions with the agency, we would expect the agency to require a Phase 3 study before granting an EUA approval or a general approval.
>
> We're in discussions now to understand the final study design and what the agency would expect. And then we need to make a kind of sober evaluation as to is it a doable study in light of the waning rates of COVID around the world and then we can make an appropriate decision.

77.     That same day, a few hours before markets closed, Molecular Partners issued a

press release acknowledging Narasimhan's earlier comments regarding ensovibep's development,

stating, in relevant part:

> Molecular Partners . . . is providing an update following comments provided by
> Novartis during its quarterly earnings call today. In the call, Novartis' CEO, Vas
> Narasimhan stated that [EUA] for ensovibep, which is filed and in review with the
> [FDA], may require additional clinical data to be authorized.
>
> Vas Narasimhan also noted the current omicron wave of SARS-Cov-2, and the
> lower incidents of hospitalization associated with it, has made clinical
> investigations challenging to execute in this evolving environment. Novartis is
> engaging with the FDA to align on a potential Phase 3 study design that could
> provide the additional data the agency is seeking for the EUA or full regulatory
> approval.

78.     Following these disclosures, Molecular Partners' ADS price fell $2.68 per ADS, or

16.17%, to close at $13.89 per ADS on April 26, 2022.

79.     Then, also on April 26, 2022, during after-market hours, Molecular Partners issued

another press release, disclosing, in relevant part:

> Amgen, its collaboration partner for MP0310 (AMG 506), has informed the
> Company of their decision to return global rights of MP0310 to Molecular Partners
> following a strategic pipeline review. Molecular Partners is presently conducting a
> phase 1 study of MP0310 and will look to present full phase 1 data at a scientific
> conference when available.
>
> * * *
>
> No additional clinical studies of MP0310 have been planned at this time. Following
> completion of the ongoing Phase 1 study, the Company will look to initiate
> discussions with potential collaborators.
>
> The collaboration with Amgen was initiated in December 2018, providing an
> upfront payment of $50 million to Molecular Partners. Per the terms of the
> agreement, Molecular Partners is conducting the phase 1 clinical trial of MP310.
> Under the agreement with Amgen, following Phase 1 data, Amgen would have had
> the right to progress the program into later stage development, including into
> combination trials.

80.     On this news, Molecular Partners' ADS price fell $5.19 per ADS, or 37.37%, to close at $8.70 per ADS on April 27, 2022—a total decline of $7.87 per ADS, or 47.5%, over two consecutive trading days, and 59.06% below the $21.25 per ADS IPO price.

81.     As of the time this Complaint was filed, the price of Molecular Partners' ADSs continues to trade below the $21.25 per ADS IPO price, damaging investors.

82.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Molecular Partners ADSs pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or Molecular Partners securities during the Class Period; and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

84.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Molecular Partners securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Molecular Partners or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

85.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

86.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Molecular Partners;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Molecular Partners to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Molecular Partners securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

88.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

89.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Molecular Partners securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Molecular Partners securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

90.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

91.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

92.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93.     This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

94.     During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Molecular Partners securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Molecular Partners securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

95.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents

described above, including statements made to securities analysts and the media that were designed to influence the market for Molecular Partners securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Molecular Partners' finances and business prospects.

96.     By virtue of their positions at Molecular Partners, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

97.     Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Molecular Partners, the Exchange Act Individual Defendants had knowledge of the details of Molecular Partners' internal affairs.

98.     The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Molecular Partners.  As officers and/or directors of a publicly-held company, the

Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Molecular Partners' businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Molecular Partners securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Molecular Partners' business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Molecular Partners securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

99.     During the Class Period, Molecular Partners securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Molecular Partners securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Molecular Partners securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Molecular Partners securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

100.    By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

102.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

103.    During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Molecular Partners, and conducted and participated, directly and indirectly, in the conduct of Molecular Partners' business affairs.  Because of their senior positions, they knew the adverse non-public information about Molecular Partners' misstatement of income and expenses and false financial statements.

104.    As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Molecular Partners' financial condition and results of operations, and to correct promptly any public statements issued by Molecular Partners which had become materially false or misleading.

105.    Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Molecular Partners disseminated in the marketplace during the Class Period concerning Molecular Partners' results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Molecular Partners to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants, therefore, were "controlling persons" of Molecular Partners within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Molecular Partners securities.

106.    Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Molecular Partners.  By reason of their senior management positions and/or being directors of Molecular Partners, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Molecular Partners to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Molecular Partners and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

107.    By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Molecular Partners.

## COUNT III

**(Violations of Section 11 of the Securities Act Against the Securities Act Defendants)**

108.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

109.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

110.    The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

111.    Molecular Partners is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

112.    As issuer of the shares, Molecular Partners is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

113.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

114.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

115.    Plaintiff acquired Molecular Partners shares pursuant and/or traceable to the Offering Documents for the IPO.

116.    Plaintiff and the Class have sustained damages.  The value of Molecular Partners' ADSs has declined substantially subsequent to and because of Defendants' violations.

## <u>COUNT IV</u>

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)**

117.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

118.    This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

119.   The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Molecular Partners within the meaning of Section 15 of the Securities Act.   The Securities Act Individual Defendants had the power and influence and exercised the same to cause Molecular Partners to engage in the acts described herein.

120.   The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

121.   By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  July 12, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: 53711A0A-901B-4640-B8FD-207BC1DC8C4B

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _Marianne S. Freudiger_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Molecular Partners AG ("Molecular Partners" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Molecular Partners securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired: (a) Molecular Partners American Depositary Shares ("ADS") pursuant and/or traceable to the Offering Documents issued in connection with the Company's initial public offering conducted on or about June 16, 2021 (the "IPO"); and/or (b) Molecular Partners ADSs during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in: Molecular Partners ADSs pursuant and/or traceable to the Offering Documents issued in connection with the Company's IPO; and/or Molecular Partners ADSs during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

DocuSign Envelope ID: 53711A0A-901B-4640-B8FD-207BC1DC8C4B

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed** __5/28/2022_____
              **(Date)**

DocuSigned by:

Marianne S. Freudiger

027517FE6ED14C6...

**(Signature)**

Marianne S. Freudiger
**(Type or Print Name)**

**Molecular Partners AG (MOLN)**                                    **Marianne S. Freudiger**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 1/12/2022 | 54 | $25.9900 |