UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES MERRITT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MOLECULAR PARTNERS AG, PATRICK AMSTUTZ, ANDREAS EMMENEGGER, WILLIAM M. BURNS, AGNETE FREDRIKSEN, STEVEN H. HOLTZMAN, SANDIP KAPADIA, VITO J. PALOMBELLA, MICHAEL VASCONCELLES, and DOMINIK HOCHLI,<br><br>Defendants. | Case No. 1:22-cv-05925-ER |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

| | | |
|---|---|---|
| Dated: | July 24, 2023 | COOLEY LLP<br>Brian M. French<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>bfrench@cooley.com<br><br>Koji Fukumura (*pro hac vice* forthcoming)<br>10265 Science Center Drive<br>San Diego, CA 92121<br>Tel: (858) 550-6000<br>kfukumura@cooley.com<br><br>Luke T. Cadigan (*pro hac vice* forthcoming)<br>Elizabeth M. Wright (*pro hac vice* forthcoming)<br>Zachary Sisko (*pro hac vice* forthcoming)<br>500 Boylston Street, 14th Floor<br>Boston, MA 02116<br>Tel: (617) 937-23000<br>lcadigan@cooley.com<br>ewright@cooley.com<br>zsisko@cooley.com |

i

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    I.      Molecular Partners' Innovative Technology ........................................................ 2

    II.     MP0310 and the Amgen Licensing Agreement........................................................ 4

    III.    Competition for the Treatment of FAP-Positive Tumors ...................................... 5

    IV.    Molecular Partners Initiates Its IPO....................................................................... 7

    V.     Amgen Terminates the Amgen Agreement ......................................................... 10

LEGAL STANDARDS ...................................................................................................... 10

ARGUMENT...................................................................................................................... 11

    I.      The ACAC is Improperly Puzzle Pled.................................................................. 14

    II.     The ACAC Contains No Facts Demonstrating Any Statement Was False or Misleading .................................................................................................... 15

          A.     The ACAC Contains No Facts That Are Inconsistent with Statements 1-5........................................................................................ 16

          B.     Plaintiff Fails to Allege That Statements 4, 5, and 6 Are Actually False ......................................................................................... 19

    III.    Statements 1, 2, and 3 Are Inactionable Statements of Opinion and Corporate Puffery................................................................................................. 20

    IV.    Statements 2, 4, and 6 Are Forward-Looking Statements ................................... 22

    V.     Plaintiff Fails to Plead a Section 15 Claim.......................................................... 25

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aratana Therapeutics Inc.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018). ...............................................................................20, 21

*ATSI Commc'ns v. Shaar Fund*,
493 F.3d 87 (2d Cir. 2007)........................................................................................................2

*In re Avon Prods. Sec. Litig.*,
2009 WL 848017 (S.D.N.Y. Feb. 23, 2009), *report and recommendation
adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009) ........................................................2

*Born v. Quad/Graphics, Inc.*,
521 F.Supp.3d 469 (S.D.N.Y. 2021).......................................................................................14

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)......................................................................................19

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Tr. Inc.*,
703 F. Supp. 2d 253 (E.D.N.Y. 2010) .....................................................................................11

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003).....................................................................................................11

*In re EDAP TMS S.A. Sec. Litig.*,
2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015).........................................................................22

*In re Express Scripts Holding Co. Sec. Litig.*,
2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017)......................................................................17, 20

*Gonzales v. Nat'l Westminster Bank*,
847 F. Supp. 2d 567 (S.D.N.Y. 2012)........................................................................................2

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002).....................................................................................................22

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
936 F.2d 759 (2d Cir. 1991).....................................................................................................11

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010).....................................................................................................22

*Luo v. Sogou, Inc.*,
465 F. Supp. 3d 393 (S.D.N.Y. 2020).......................................................................................25

*Johnson v. Sequans Commc'ns S.A.*,
2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ..................................................................23

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005)...........................................................................17

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (S.D.N.Y. 2003)............................................................................18

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
650 F.3d 167 (2d Cir. 2011).........................................................................................25

*In re Longtop Fin. Techs. Sec. Litig.*,
939 F. Supp. 2d 360 (S.D.N.Y. 2013).............................................................................2

*Miller v. Lazard, Ltd.*,
473 F. Supp. 2d 571 (S.D.N.Y. 2007)...........................................................................23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)..........................................................................................11

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)...........................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)......................................................................................................20

*In re Pareteum Sec. Litig.*,
2020 WL 3448526 (S.D.N.Y. June 23, 2020) ...............................................................15

*In re Pfizer Sec. Litig.*,
538 F. Supp. 2d 621 (S.D.N.Y. 2008)..............................................................................2

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020).................................................................22

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................................................................................21, 25

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)...........................................................................21

*Seibert v. Sperry Rand Corp.*,
586 F.2d 949 (2d Cir. 1978)..........................................................................................18

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993)..............................................................................................11

iv

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)......................................................................................18, 21

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014).................................................................................16

*Weller v. Scout Analytics, Inc.*,
    230 F. Supp. 3d 1085 (N.D. Cal. 2017) ............................................................................17

## Statutes

Securities Act of 1933
    Section 11................................................................................................................ *passim*
    Section 15.....................................................................................................................25

## Other Authorities

42 C.F.R. Part 11............................................................................................................6

Federal Rules of Civil Procedure
    Rule 8 .............................................................................................................................1

**INTRODUCTION**

On or about December 18, 2018, Molecular Partners AG ("Molecular Partners" or the "Company") entered into a Licensing and Collaboration Agreement with Amgen Inc. ("Amgen") to license Molecular Partners' unique therapeutic technology for treatment of certain cancers and jointly pursue clinical trials (the "Amgen Agreement"). Subsequently, on or about April 26, 2022, Amgen chose to opt out of the relationship. Molecular Partners clearly and repeatedly disclosed this possibility in its risk factors. Nevertheless, Plaintiff invents a violation of the securities laws from whole cloth, ignoring the Company's disclosures and the inherent uncertainties in the biopharmaceutical industry. Plaintiff's Amended Class Action Complaint ("ACAC") is a masterclass in conclusory allegations and threadbare assertions of falsity, seeking to manufacture a claim from unchallenged statements of fact and inactionable corporate opinions.

The pleading deficiencies in the ACAC are as numerous as they are obvious. As an initial matter, the ACAC is improperly puzzle pled, indiscriminately challenging block quotes from Molecular Partners' Registration Statement without identifying with any specificity which statements are supposedly false and why. Rather than plead facts to support his falsity theories, Plaintiff, for each challenged statement, repeats the same vague, meritless reasons each is allegedly misleading, leaving both Defendants and the Court to guess what Plaintiff contends is actually false or misleading. This comes nowhere close to meeting the pleading standard required by Rule 8, and the ACAC should be dismissed on that basis alone.

Further, in Plaintiff's telling, each of the challenged statements—which are either true statements of fact or inactionable corporate opinions—is allegedly false or misleading because Defendants failed to disclose (1) the existence of competitors in the market, or (2) Molecular Partners' expiring patents, which purportedly reduced Amgen's dedication to the Amgen Agreement. But Plaintiff conspicuously does not challenge the accuracy of any challenged

1

statement, does not allege any details about Defendants' knowledge of Amgen's feelings toward the Agreement, and does not assert that any representations about the Amgen Agreement were false or without reasonable basis when made. Moreover, the facts that Plaintiff claims were omitted were both publicly available and specifically disclosed to investors in the same Registration Statement now challenged, accompanied by ample risk disclosures.

In essence, Plaintiff would hold Defendants liable based on the existence of competition in the oncology space and the Company's expiring patents, asserting that these facts, which were already thoroughly disclosed, somehow obligated Defendants to do even more to tell investors *than they already did* that the Amgen Agreement could possibly be terminated. The securities laws require far more than speculative theories of falsity and conclusory allegations. Accordingly, the ACAC should be dismissed with prejudice.

## **BACKGROUND**[1]

### I.     **Molecular Partners' Innovative Technology**

Molecular Partners is a Swiss clinical-stage biopharmaceutical company that focuses on the development and commercialization of unique therapeutic proteins called "DARPins." (¶ 24.)[2] Each of the Individual Defendants is or was an officer and/or director of Molecular Partners and held their positions at the time of the Company's initial public offering in the United States

---

[1] On a motion to dismiss, the Court may consider both "documents incorporated into the complaint by reference," *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007), and "matters of which a Court may take judicial notice," *In re Pfizer Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008). The Court may take judicial notice of "public documents required to be filed with the SEC," *In re Longtop Fin. Techs. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013); "news articles" and "public documents," *Gonzales v. Nat'l Westminster Bank*, 847 F. Supp. 2d 567, 569 (S.D.N.Y. 2012); and "analyst reports," *In re Avon Prods. Sec. Litig.*, 2009 WL 848017, at *24 n.10 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009).

[2] "¶" refers to paragraphs of the ACAC. "Ex." refers to the exhibits attached to the Declaration of Zachary Sisko, filed concurrently herewith. Unless otherwise noted, all emphasis is added, and all internal citations, quotation marks, and alterations are omitted.

("IPO").  (¶¶ 12-20.)  Patrick Amstutz, who has a Ph.D. in molecular biology, is Molecular Partners' Chief Executive Officer and Director, and co-founded the Company in 2004.  (¶ 12.) Andreas Emmenegger was the company's former Chief Financial Officer and has held both officer and director positions at multiple biotechnology firms.  (¶ 13.)  William M. Burns is the Chairman of Molecular Partners' Board of Directors and has substantial experience in the pharmaceutical industry, including over 28 years at Roche Pharmaceuticals ("Roche").  (¶ 14.)  Agnete Fredriksen, Steven H. Holtzman, Sandip Kapadia, Vito J. Palombella, Michael Vasconcelles, and Dominik Höchli are each Directors of Molecular Partners, all of whom have held current or previous director positions at multiple companies.  (¶¶ 15-20.)

DARPins are specially designed proteins constructed to possess unique, individualized functions allowing them to bind to cells in more targeted ways than typical proteins.  (Ex. 1, at 1, 108.)  DARPins have broad potential therapeutic applications, including the treatment of infectious diseases, oncology, T-cell engagement, and ophthalmology.  (*Id.* at 2-6.)  Molecular Partners' product pipeline reflects DARPins varied applications, with clinical trials and preclinical research underway for treatment of FAP-positive cancers,[3] acute myeloid leukemia, small-cell lung cancer, wet macular degeneration, and COVID-19, among others.  (*See* Ex. 2.)

The potential practical benefits of DARPins—which may be used individually, or combined to create multispecific DARPin candidates, also called "DARPin constructs"—are substantial.  Given their high level of biological specificity, DARPin constructs can be designed to, for example, only activate under specific circumstances, or only bind to highly specific portions

---

[3] "FAP" refers to fibroblast activation protein, a category of protein which are common markers of certain cancerous cells.  "FAP-positive cancers" thus refer to the categories of cancers in which fibroblast activation proteins are expressed in the cancerous cells, including breast cancer, colorectal cancer, pancreatic cancer, lung cancer, ovarian cancer, and bladder cancer.  (Ex. 3. at 1, 10.)

3

of a target protein. (Ex. 1 at 1.) This more specific binding and activation potentially creates fewer toxicity and safety concerns than traditional treatments. (*Id.* at 4.) DARPins also are potentially more stable and soluble than traditional protein or antibody-based therapeutics, and may be manufactured with a high yield-to-cost ratio. (*Id.* at 1.) In comparison to typical monoclonal antibodies, in particular, "the smaller size and simple architecture of DARPin binders" may allow them to be "ideally suited to perform multiple biological functions in a single molecule." (*Id.* at 116.)

## II.   MP0310 and the Amgen Licensing Agreement.

Molecular Partners developed MP0310, a DARPin construct engineered for use in treating FAP-positive cancers. (*Id.* at 4.) As explained in the Registration Statement, MP0310 works by binding to the FAP located on cancerous tumors, while simultaneously binding to a tumor-localized immune cell activator. (*Id.*) The DARPin itself, however, acts only as the binding agent, meaning it still requires an immune cell activator to stimulate an immune response. (*Id.* at 112.)

On December 18, 2018, Molecular Partners entered into the Amgen Agreement with Amgen for the clinical development of MP0310. (¶ 29.) Amgen is a commercial-stage biopharmaceutical company headquartered in California and one the largest pharmaceutical companies in the world, surpassing over \$26.3B in total revenues in FY2022 with 27 commercial products for sale. (Ex. 4 at 1, 6-7.)

Following the execution of the Amgen Agreement, Molecular Partners and Amgen began collaborating on the clinical development of MP0310 (also known as AMG 506) for treatment of FAP-positive cancers. Amgen received "exclusive global development and commercial rights for MP0310," while Molecular Partners retained certain rights for the development and commercialization of its proprietary DARPin candidates in combination with MP0310. (¶ 29; Ex. 5.) The Amgen Agreement tasked the parties with "jointly evaluat[ing] MP0310 in combination

with Amgen's oncology pipeline products," with Molecular Partners primarily leading both clinical development and regulatory activities.  (¶¶ 29-30; Ex. 5.)  Molecular Partners also received an upfront payment of $50 million in consideration for the Amgen Agreement, which also provided up to $497 million in milestone payments triggered by certain development, regulatory, and commercial goals.  (¶¶ 29-30; Ex. 5.)

Phase 1 clinical trials for MP0310 began in 2019.  The MP0310 DARPin was engineered to be a tumor-localized binding agent, utilizing a 4-1BB immune cell activator, and tested for its use in treating FAP-positive cancers.  (Ex. 1 at 111.)  As the Registration Statement disclosed, Molecular Partners "engineered AMG 506 (MP0310) to activate 4-1BB only when bound to FAP." (*Id.* at 112.)  The dose escalation phase of the Phase 1 clinical trial was initiated in late 2019 and investigated "safety and the tumor-restricted activation of immune-cells with initial results demonstrating proof of [mechanism of action] after a single injection and a manageable adverse event profile consistent with [mechanism of action]." (*Id.*)  These Phase 1 trials were ongoing at the time of the IPO.  (¶ 27.)

## III.    Competition for the Treatment of FAP-Positive Tumors

Specialized treatment for the numerous types of FAP-positive cancers is hardly a unique concept.  Numerous market analysts, for example, noted that both at the time of the Amgen Agreement and at the time of the IPO, the market for oncology treatments was highly competitive. (*See, e.g.*, Ex. 6 at 15 ("MP0310 has only recently entered clinical development, hence the target indications have yet to be communicated.  In general, most indication areas within oncology are quite crowded."); Ex. 7 at 2 (noting that risk for Molecular Partners' investment was potential "failure of drug candidates to achieve commercial success due to market size, penetration rate, or competition").)  Both prior to and at the time of the IPO, numerous companies were engaged in clinical trials for treatment of solid tumor cancers, including both Molecular Partners and Roche

5

which were pursuing treatments targeting FAP. (*See* Ex. 6 at 16 (noting that "[p]ractically all the large pharma players, as well as dozens of smaller companies, are active in oncology," which is a sector with "fierce" competition).)

Among Molecular Partners' numerous competitors was Roche, a commercial-stage Swiss biopharmaceutical company.  As described below, as of April 2021 (two months before the IPO), Roche began enrolling patients in early-stage clinical trials for two drug candidates for the treatment of FAP-positive solid tumors.  (¶ 37.)  Roche also had an ongoing clinical trial for a third similar candidate.  (*Id.*)

Roche's then-ongoing Phase 2 clinical trial, which began in February 2018, studied simlukafusp alfa (RG7461), a monoclonal antibody targeting FAP in patients with advanced or metastatic solid tumors.  (*See* Ex. 8.)  As of February 2023, prior to the ACAC being filed, that trial was voluntarily terminated by Roche.  Information regarding this clinical trial—including its progress, clinical trial plan, and other relevant information—was publicly available at the time of Molecular Partners' IPO on the National Institute of Health's Clinical Trials website. (*See id.* (first posted to clinicaltrials.gov on December 29, 2017).)[4]

In April 2021, Roche initiated a Phase 1/2 clinical trial for RG7827/RO7122290, another monoclonal antibody targeting FAP for the treatment of metastatic colorectal cancer.  (*See* Ex. 9.) That Phase 1/2 clinical trial is ongoing, with an estimated completion date of July 2025. Information regarding this trial was similarly available to the public at the time of Molecular Partners' IPO.  (*See id.* (first posted to clinicaltrials.gov on April 1, 2021).)

---

[4] Since August 2017, most clinical trials occurring in the United States are required to be listed on clinicaltrials.gov pursuant to FDA-promulgated rules.  *See* 42 C.F.R. Part 11.

Also in April 2021, Roche initiated a Phase 1 trial for RG6189/RO7300490, a monoclonal antibody targeting FAP for the treatment of solid tumors.  (*See* Ex. 10.)  That Phase 1 clinical trial also remains ongoing, with an estimated completion date of August 2026.  Information regarding this trial's progress was also available to the public at the time of Molecular Partners' IPO.  (*See id*. (first posted to clinicaltrials.gov on April 23, 2021).)

## IV.    Molecular Partners Initiates Its IPO

On April 22, 2021, Molecular Partners filed a Registration Statement on Form F-1 in advance of its forthcoming IPO.  Following several amendments, including an amendment on Form F-1/A filed on June 14, 2021, the Registration Statement was declared effective by the U.S. Securities and Exchange Commission on June 15, 2021.  (¶ 25; *see also* Ex. 1.)

The Registration Statement included a variety of specific risk factors that disclosed to investors the substantial risks inherent to investing in clinical stage pharmaceutical companies. Among other things, the Registration Statement warned investors about the following risks:

***Competition in the Oncology Space.***  The Registration Statement contained numerous risk disclosures informing investors of the "significant competition" in the highly contested solid tumor oncology market and pharmaceutical space:

- "***Competition in the oncology space is intense***, with several common methods of treatment for patients with cancer, including surgery, radiation and drug therapy, and approved drugs that are well established therapies widely accepted by physicians, patients and third party payers. In addition, companies focused on immunotherapies, such as checkpoint inhibitors, seek to differentiate their immuno-oncology products either by identifying novel immune checkpoint targets or by combining established immune checkpoint inhibitors. ***If approved, either of MP0310 or MP0317 would compete with agents that are currently in development including monoclonal antibodies, or mAbs, and other small molecule approaches.***"  (Ex. 1 at 166.)

- "***We face significant competition for our drug discovery and development efforts, and if we do not compete effectively, our commercial opportunities will be reduced or eliminated. The market for pharmaceutical products is highly competitive.*** Our competitors include many established pharmaceutical companies, biotechnology companies, universities and other research or commercial institutions, many of which have

7

substantially greater financial, research and development resources than us. Large pharmaceutical companies, in particular, have extensive experience in clinical testing, obtaining regulatory approvals, recruiting patients and manufacturing pharmaceutical products. . . . The fields in which we operate are characterized by rapid technological change and innovation. ***There can be no assurance that our competitors are not currently developing, or will not in the future develop, technologies and products that are equally or more effective or are more economically attractive as any of our current or future technology or product.***" (*Id.* at 25.)

***Reliance on Agreements with Third Parties.***  The Registration Statement also warned investors about the potential risks regarding Molecular Partners' collaboration with licensing partners such as Amgen, disclosing:

- "We are, and expect to continue to be, dependent on partnerships with partners relating to the development and commercialization of our existing and future research programs and product candidates. . . . Our dependence on collaborative partners subjects us to a number of risks, including, but not limited to, the following:

  o we may not be able to control the amount and timing of resources that the collaboration partner devotes to our research programs and product candidates; . . .

  o ***our anticipated payments under any partnership agreement (e.g., royalty payments for licensed products) may not materialize***; . . .

  o ***a collaborative partner may decide not to pursue, or discontinue the collaborative development of, our product candidates***. . . ." (*Id.* at 46-47.)

- We may not be able to negotiate collaborations on a timely basis, on acceptable terms, or at all. If we are unable to do so, we may have to curtail the development of the product candidate for which we are seeking to collaborate, reduce or delay its development program or one or more of our other development programs, delay its potential commercialization or reduce the scope of any sales or marketing activities or increase our expenditures and undertake development or commercialization activities at our own expense. If we elect to increase our expenditures to fund development or commercialization activities on our own, we may need to obtain additional capital, which may not be available to us on acceptable terms or at all. ***If we do not have sufficient funds, we may not be able to further develop product candidates or bring them to market and generate product revenue***." (*Id.* at 47-48.)

***Disclosures Regarding DARPin Patents.***  Molecular Partners previously held an exclusive license from the University of Zurich for the base technology used in its DARPin platform.  (*Id.* at 146.)  Three of the four U.S. patents covering this technology expired in September 2021, with

8

the last set to expire this year. (*Id.* at 146-47.) Molecular Partners elected to terminate the license agreement with the University of Zurich effective October 2021. (*Id.*)

Molecular Partners explicitly and repeatedly disclosed in the Registration Statement that these patents were expiring explicitly throughout the Registration Statement. (*Id.* at 8 ("The base patents relating to the DARPin base technology we use to generate our DARPin product candidates, which we exclusively license from the University of Zurich, are expected to expire in September 2021, and we have elected to terminate the exclusive license agreement effective October 2021."); *id.* at 56 (same).) Molecular Partners also warned investors in its Registration Statement that, "[o]nce these patents licensed from the University of Zurich expire and our license terminates in 2021, others may use the basic repeat protein technology disclosed and claimed in these patents." (*Id.* at 147.) The Company further explained that this "may lead to increased competition in the repeat protein field, especially if [its] DARPin drug candidates prove to be successful in the clinic," and noted the Company has "taken various steps to attempt to mitigate potential effects of the patent expiration." (*Id.*)

*Use of Funds*. Finally, Molecular Partners fully informed investors that the use of funds from the IPO was discretionary, and that the Company could not guarantee that milestone payments or revenue from licensing agreements (such as the Amgen Agreement) would continue to be available:

- "If any of our licenses terminate with our licensees, *it may be necessary for us to assume responsibility at our own expense for the development of the applicable product candidates*. In that event, we *would likely be required to limit the size and scope of one or more of our programs* or increase our expenditures and seek additional funding, which may not be available on acceptable terms or at all, which would materially adversely affect our business, financial condition and results of operations." (*Id.* at 49.)

- "*Our board of directors will have broad discretion in the application of the net proceeds from this offering* and could spend the proceeds in ways that do not improve our results of operations or enhance the value of the ADSs." (*Id.* at 68.)

9

- "*We cannot guarantee that future financing will be available in sufficient amounts or on commercially reasonable terms, if at all.*"  (*Id.* at 17.)

## V.  Amgen Terminates the Amgen Agreement

On April 26, 2022, Molecular Partners announced that Amgen had terminated the Amgen Agreement following a strategic pipeline review.  (*See* Ex. 11; ¶ 45.)  The licensing rights to MP0310 were returned to Molecular Partners.  The Company continued to pursue the Phase 1 study, and announced its intention to initiate further discussions with other collaborators.  (*Id.*)

Shortly after the Amgen Agreement was terminated, the initial Complaint was filed, which brought claims pursuant to the Securities Act of 1933 ("Securities Act") and Securities and Exchange Act of 1934 ("Exchange Act") based on alleged misstatements and omissions in Molecular Partners' Registration Statement and public statements.  Notably, the initial Complaint also included allegations regarding purported misstatements and omissions related to Molecular Partners' collaboration with Novartis on envisobep, a DARPin designed for treatment of COVID-19.[5]  (*See* ECF No. 1.)

Following the Court's order appointing a lead Plaintiff and Lead Counsel in this Action (ECF No. 14), Plaintiff filed the Amended Class Action Complaint, which brings two claims pursuant to Sections 11 and 15 of the Securities Act.  (ECF No. 18.)  The ACAC drops the Exchange Act claims and all allegations regarding envisobep and Novartis.

## LEGAL STANDARDS

To state a claim under Section 11 of the Securities Act, a plaintiff must sufficiently allege that the offering materials (such as a Registration Statement) in connection with a public offering

---

[5] On April 26, 2022—the same day the Amgen Agreement was terminated—Molecular Partners issued a press release responding to comments made by Novartis's CEO regarding envisobep and the potential need for further clinical trials in support of an Emergency Use Authorization. (*See* Ex. 12.)

"contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010).  The "central inquiry" in determining whether a statement is misleading under Section 11 is "whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991).

Omissions of material fact are actionable only if there was a duty to disclose that information, which rendered a disclosure misleading.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Misstatements or omissions are material only if they "significantly alter[] the total mix of information made available" to a reasonable investor. *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).  While the heightened pleading standard of the Private Securities Litigation and Reform Act generally does not apply to claims brought under the Securities Act, conclusory pleadings are not enough: a "pleading that does nothing more than recite facts and bare legal conclusions is insufficient" to state a claim.  *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Tr. Inc.*, 703 F. Supp. 2d 253, 258 (E.D.N.Y. 2010).

## **ARGUMENT**

Plaintiff contends the following six statements (each a "Statement," and collectively the "Statements") in the Registration Statement, relating to the Amgen Agreement and Molecular Partners' use of IPO funds, misled investors:

- **Statement 1:** "We believe our partnership with Amgen allows for a meaningful investigation of combination therapies, given Amgen's expertise in the field of oncology …"  (¶ 36; Ex. 1, at 131.)

- **Statement 2:** "We expect that the ongoing Phase 1 clinical trial of AMG 506 (MP0310), should it demonstrate sustained activity of 4-1BB, will produce data in 2021 to inform

11

potential combination studies which would be conducted by Amgen assets." (¶ 36; Ex. 1, at 131.)

- **Statement 3:** "We believe AMG 506 (MP0310) could be particularly relevant as a combination agent with potential combination studies in collaboration with Amgen." (¶ 36; Ex. 1, at 4.)

- **Statement 4:** "Under the Amgen Agreement, we and Amgen will jointly evaluate MP0310 / AMG 506 in combination with Amgen's oncology pipeline products, including its investigational BiTE molecules. In accordance with a mutually agreed development plan, we will conduct the Phase 1a clinical trials and Amgen will be responsible for all subsequent development of MP0310 / AMG 506 after completion of the Phase 1a clinical trials. We and Amgen have established a joint steering committee to oversee the research, information sharing, and potential amendments of the research plan. Each party is responsible for development costs incurred by it until the beginning of Phase 2 clinical trial, after which point the parties will each contribute a fixed percentage of the development costs on the first three indications. Amgen is required to use commercially reasonable efforts to develop MP0310 / AMG 506 in combination with at least one of Amgen's oncology pipeline products in certain major markets." (¶ 38; Ex. 1, at 150.)

- **Statement 5:** "The Amgen Agreement expires on a country-by-country basis upon the expiration of Amgen's payment obligations in such country. Amgen may terminate the Amgen Agreement in its entirety for convenience following a certain notice period. Either party may terminate the Amgen Agreement upon an uncured material breach of the agreement or insolvency of the other party following a certain notice period. Following any termination, we have certain rights to receive a license to certain intellectual property generated by Amgen under the Amgen Agreement for purposes of continued development and commercialization of MP0310 / AMG 506." (¶ 40; Ex. 1, at 151.)

- **Statement 6:** "We currently intend to use the net proceeds from this offering, together with our existing cash and cash equivalents, to fund our planned Phase 1 clinical trial of MP0317, to advance the expansion of our research and development activities in our infectious disease program, which is expected to include the selection of an additional product candidate targeting infectious disease and the preclinical research and initiation of IND-enabling studies with respect to this product candidate, to advance our liquid tumor portfolio initially in acute myeloid leukemia through Phase 1 clinical development, and leveraging our CD3 platform to develop additional product candidates thereafter, to advance our platform and other potential product candidates and for working capital and other general corporate purposes.

  ….

  We currently expect to use the net proceeds from this offering, together with our existing cash and cash equivalents, as follows:

  approximately $25 (CHF 22) million to fund our planned Phase 1 clinical trial for MP0317, the second product candidate in our oncology program, to completion;

12

approximately $40 (CHF 36) million towards the expansion of our research and development activities in our infectious disease program, which is expected to include the selection of an additional product candidate targeting infectious disease and the preclinical research and initiation of IND-enabling studies with respect to this product candidate;

approximately $43 (CHF 39) million to advance our liquid tumor portfolio initially in acute myeloid leukemia, or AML, through Phase 1 clinical development, and leveraging our CD3 platform to develop additional product candidates thereafter; and

the remainder to fund the advancement of our platform and other potential product candidates, working capital and other general corporate purposes." (¶ 42; Ex. 1, at 10. 83.)

According to Plaintiff, each of the statements regarding the Amgen Agreement (Statements 1-5) was materially false and misleading because the Registration Statement purportedly omitted that (1) "the value of the Amgen Agreement *to Amgen* had changed" as a result of competition in the treatment of FAP-positive cancers, thereby increasing the "likelihood of its termination of the Amgen Agreement," and (2) Molecular Partners' DARPin patents were set to expire. Plaintiff alleges a substantively identical theory of falsity for each of Statements 1-5. (¶¶ 37, 39, 41.) As to Statement 6, Plaintiff contends that Molecular Partners' forecasts regarding its use of funds were misleading because the Registration Statement did not disclose that the Amgen Agreement was "in jeopardy," meaning Molecular Partners "would be forced to instead use the proceeds of the IPO for the development of MP0310." (¶ 43).

None of these Statements was false or misleading. Each of the Statements above either constitute true statements of fact (which Plaintiff does not dispute) or corporate opinion, neither of which is actionable under the Securities Act. Plaintiff's theory of falsity is contrived and implausible: Plaintiff would hold Molecular Partners liable based on the existence of competition in the oncology space and the Company's expiring patents—facts that were disclosed by the Company and otherwise well known by investors. Yet Plaintiff appears to assert that Molecular Partners should have done more, despite having no duty to disclose the very information it had, in fact, disclosed. Further buttressing the disclosures, the Registration Statement also contains ample

13

risk disclosures warning investors of the exact risks that ultimately materialized, rendering the forward-looking statements inactionable.

Put simply, the ACAC consists of nothing more than thinly pled conclusory assertions, relying on no well-pled allegations and presenting an attenuated-at-best theory of falsity. Because Plaintiff has not alleged a single actionable misstatement or omission, the Court should dismiss the ACAC in its entirety, with prejudice.

## I.     THE ACAC IS IMPROPERLY PUZZLE PLED

The ACAC offers little more than a rote recitation of portions of Molecular Partners' Registration Statement with no meaningful explanation for how any Statement could be false or misleading to investors. The ACAC is therefore a quintessential "puzzle pleading"—it simply copies and pastes lengthy block quotes from the Registration Statement, and summarily alleges the entirety of these quoted statements are false and misleading for nearly identical, conclusory reasons. *See Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478-79 (S.D.N.Y. 2021) (dismissing "puzzle pleading" because it "does little to describe what portion of each quotation constitutes a false representation, instead placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts").

Statement 4 best exemplifies these insurmountable pleading issues. Plaintiff challenges numerous, undifferentiated statements, including:

- Jointly with Amgen, Molecular Partners will "evaluate MP0310 / AMG 506 in combination with Amgen's oncology pipeline products, including its investigational BiTE molecules";

- Molecular Partners and Amgen "have established a joint steering committee to oversee the research, information sharing, and potential amendments of the research plan"; and

- "Each party is responsible for development costs incurred by it until the beginning of Phase 2 clinical trial, after which point the parties will each contribute a fixed percentage of the development costs on the first three indications."

(¶ 38; Ex. 1, at 150.) Plaintiff contends that these statements (along with every other statement

14

quoted in paragraph 38 of the ACAC) are false and misleading. But nowhere in the ACAC does Plaintiff allege facts showing that these statements were, in fact, false and misleading. For example, Plaintiff does not and cannot allege that the parties were *not* planning to evaluate MP0310 / AMG 506 together, that they did *not* establish a joint steering committee, or that each party was *not* responsible for development costs it incurred until the Phase 2 clinical trials. And, unsurprisingly, nowhere does Plaintiff allege how these statements could be misleading because of increased competition in the oncology space, or the expiration of Molecular Partners' patents. Simply regurgitating a block quote from the Registration Statement and leaving both Defendants and the Court "to search the long quotations . . . [and] determine on [their] own initiative how and why the statements were false" does not state a claim. *In re Pareteum Sec. Litig.*, 2020 WL 3448526, at *2 (S.D.N.Y. June 23, 2020).

The same problem infects the entirety of the ACAC, which is filled with the same sort of conclusory, "puzzle pleading" allegations that courts have consistently rejected. *See, e.g.*, *id.* (dismissing Section 11 and 15 claims for "puzzle pleading" because they failed to satisfy pleading requirements under Rule 9(b) *and* Rule 8). Even without addressing the ACAC's other deficiencies, these errors provide an independently sufficient basis for dismissal.

## II.    THE ACAC CONTAINS NO FACTS DEMONSTRATING ANY STATEMENT WAS FALSE OR MISLEADING

Regardless of whether the ACAC is impermissibly puzzle pled, the individual puzzle pieces still fail to plead a Section 11 claim. The challenged Statements can be separated into three categories: (1) statements regarding the potential of the Company's collaboration with Amgen (Statements 1-3), (2) statements reciting the terms of the Amgen Agreement (Statements 4-5), and (3) one statement regarding Molecular Partners' intended use of funds generated from its IPO (Statement 6). Within each of these categories, as noted above, Plaintiff recites the same

15

conclusory reasoning supposedly rendering each statement false or misleading. But the ACAC lacks any nonconclusory facts supporting these falsity allegations, thus dooming Plaintiff's claims.

A.    **The ACAC Contains No Facts That Are Inconsistent with Statements 1-5**

As explained above, Plaintiff claims the Registration Statement omitted the following facts regarding the Amgen Agreement thereby rendering the Statements misleading: (i) a competitor, Roche, began enrolling patients in trials for two of its own drug candidates for the treatment of FAP-positive solid tumors, which were each further along and larger than the MP0310 trial, and (ii) three of the four DARPin base technology patents licensed from the University of Zurich were set to expire. (¶¶ 37, 39, 41.) Plaintiff's theory appears to be that the existence of competitors and the time limits on the relevant patents must have impacted the viability of the Amgen Agreement *to Amgen*—not Molecular Partners—and increased the likelihood that the Amgen Agreement would be terminated, rendering Statements 1-5 false. This flimsy hypothesis comes nowhere close to stating a Securities Act claim.

Plaintiff cannot manufacture a Securities Act claim by simply recharacterizing the Statements, and implying facts that do not exist. *See Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 572 (S.D.N.Y. 2018) ("In assessing these statements, the Court focuses on the statements themselves, not plaintiff's recasting of them."); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) ("[P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claim[s] cannot be based on a backward-looking assessment of the registration statement."). The ACAC does not even suggest a connection between Roche's clinical trials or the relevant patents and Amgen's decision to terminate the Amgen Agreement. The ACAC simply concludes that there must be such a connection, because the Amgen Agreement was in fact terminated. But the Securities Act requires more, and Plaintiff does not sufficiently allege falsity where "the reasons Plaintiff offers as to why

16

the statement is false or misleading bear no connection to the substance of the statement itself." *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1094 (N.D. Cal. 2017).

Moreover, Plaintiff's theory of falsity for each of Statements 1-5 is fundamentally flawed because it asserts the Defendants omitted "that the value of the Amgen Agreement *to Amgen* had changed."  (¶¶ 37, 39, 41.)  Put differently, Plaintiff would hold Molecular Partners liable for failing to disclose information about their licensing partner's corporate decisions.  But companies and officers "need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017) (dismissing claims for failure to allege knowledge of "contradictory information" contrary to public statements about relationship with partner).  Not surprisingly, Plaintiff makes no attempt to allege that Molecular Partners knew—or even should have known—the value *Amgen* placed on the Amgen Agreement.  That information was solely in Amgen's possession.  Indeed, Plaintiff does not explain what, if any, knowledge Defendants possessed regarding Amgen's valuation of the Agreement at the time of the IPO.  This failure destroys Plaintiff's falsity theory.  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("[A] plaintiff must allege facts demonstrating the defendant possessed the omitted information at the time the registration statement became effective and that the defendant had a duty to disclose that information.").

Not only does the ACAC fail to offer *any* logical connection between Plaintiff's theory of falsity and the challenged Statements, it also does not show that Defendants had a duty to disclose the existence of the Roche trials and the patent expiration dates.  Defendants had no such duty because the "omitted" information was either already disclosed or publicly available.

17

*First*, the Roche trials were public knowledge and like all clinical trials in the United States, information regarding the trial was available to the investing public on the clinicaltrials.gov website.    (*See supra*, Background, Section III.)    "Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information."  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (S.D.N.Y. 2003); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("Although the underlying philosophy of federal securities regulations is that of full disclosure . . . , there is no duty to disclose information to one who reasonably should be already aware of it."); *cf. Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) (explaining that when "a complex financial instrument whose value is tied to FDA is approval is involved," investors can be expected to apprise themselves of relevant FDA developments).    Investors therefore would have been well aware of these competitive trials, and even more fundamentally, they would have understood that Molecular Partners was not the only company pursuing treatment of FAP-positive cancers.

*Second*, far from omitting information about the patent expiration dates, the Registration Statement explicitly disclosed (multiple times) that these patents were set to expire:

> We hold an exclusive license from the University of Zurich on patent applications and patents relating to the DARPin base technology that we use to generate our DARPin product candidates. ***The base patents under this license agreement will expire in September 2021***, except that one U.S. patent under the license agreement will expire in 2023.

(Ex. 1 at 56; *see also id.* at 146-47; *supra*, Background, Section IV.)  For obvious reasons, Plaintiff cannot base their Securities Act claims on information that was both publicly available and unambiguously disclosed to investors.  *In re Keyspan*, 383 F. Supp. 2d at 377.

For these reasons as well, Plaintiff's claims as to these Statements should be dismissed.

18

**B.      Plaintiff Fails to Allege That Statements 4, 5, and 6 Are Actually False**

Statements 4, 5, and 6 cannot be actionable under the Securities Act for a similarly simple reason: they are undisputedly true statements of fact describing the Amgen Agreement and Molecular Partners' expected use of IPO funds.  (¶¶ 38-43.)

Although is "well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true," *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004), the ACAC challenges these demonstrably true statements of fact without providing any meaningful explanation for why they are false or misleading.  Statements 4 and 5, for example, simply recite key provisions from the Amgen Agreement informing investors of the clinical research plan for MP0310 (Statement 4) and the termination provisions in the Agreement (Statement 5).  Not a single allegation in the ACAC suggests that these recitations of fact inaccurately describe the Amgen Agreement's terms, or that Molecular Partners and Amgen were not in fact collaborating on the clinical research for MP0310.  Instead, Plaintiff (again) claims these statements are false because the "value" of the Amgen Agreement ***to Amgen*** had been reduced by changing market conditions.  But Statements 4 and 5 make no assertions about the "value" of the partnership between Molecular Partners and Amgen to either party—they simply explain to investors what the Agreement requires, and Plaintiff does not claim this information was inaccurate.  This is insufficient to form the basis of a Securities Act claim.  *Id.* at 557.

Statement 6, regarding Molecular Partners' intended use for the IPO funds, is similarly inactionable.  (¶ 42).  Once again, the ACAC does not challenge Statement 6's accuracy, nor does it allege any facts that undermine these statements.  Rather, Plaintiff makes the conclusory assertion that the Amgen Agreement was "in jeopardy" and therefore "Molecular Partners would be forced to instead use the proceeds of the IPO for the development of MP0310." (¶ 43).  Nothing in the ACAC suggests that these projections regarding the use of IPO funds were inaccurate at the

19

time of the IPO, and Statement 6 does not even mention MP0310 nor the Amgen Agreement. Plaintiff has failed to allege a single fact to demonstrate that, at the time of the IPO, Defendants knew Amgen would terminate the Agreement or that the Agreement was "in jeopardy." *See In re Express Scripts*, 2017 WL 3278930, at *13-14 (dismissing claims based on alleged failure to disclose subsequent termination of partner agreement, where plaintiff "fail[ed] to allege any definitive statement that [partner] no longer intended to do business with [Defendant]" or any "false or misleading statements of then-existing facts" regarding relationship of parties).

Plaintiff's claims as to Statements 4, 5, and 6 should be dismissed.

## III. STATEMENTS 1, 2, AND 3 ARE INACTIONABLE STATEMENTS OF OPINION AND CORPORATE PUFFERY

Plaintiff's Section 11 claim also should be dismissed because at least three of the challenged Statements are inactionable opinions and/or corporate puffery.

Statements 1-3 are quintessential opinion statements, reflecting "subjective statements that reflect judgments as to values that [are] not objectively determinable" and "express expectations about the future." *In re Aratana Therapeutics Inc.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018). Opinion statements are actionable only if they are both objectively false and disbelieved by a defendant when made, or if they omit "particular (and material) facts going to the basis for the issuer's opinion" such that the statement is misleading when read "fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

Statements 1, 2, and 3 each reflect Molecular Partners' corporate opinion regarding the potential for MP0310's success, and the potential fruits of the Amgen Agreement:

- "[w]e believe our partnership with Amgen allows for a meaningful investigation of combination therapies, given Amgen's expertise in the field of oncology";

- "[w]e expect that the ongoing Phase 1 clinical trial of AMG 506 (MP0310), should it demonstrate sustained activity of 4-1BB, will produce data in 2021 to inform potential combination studies which would be conducted by Amgen assets";

20

- "[w]e believe AMG 506 (MP0310) could be particularly relevant as a combination agent with potential combination studies in collaboration with Amgen."

(¶ 36.)

Consider Statement 3, which says Molecular Partners "believe[d] AMG 506 (MP0310) could be particularly relevant as a combination agent with potential combination studies in collaboration with Amgen." (*Id.*) The ACAC is bereft of facts challenging Defendants' reasonable belief that MP0310 could be "relevant" in potential future studies, nor does Plaintiff challenge the underlying clinical data or trials associated with MP0310. Indeed, nothing in the ACAC suggests the "omission" of information on (public) clinical trials or (disclosed) expiring patents rendered the statements misleading. *Tongue*, 816 F.3d at 212 ("An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."). The same logic applies to Statements 1 and 2, which similarly express Defendants' reasonable expectations regarding MP0310 and the collaboration with Amgen. Nothing in the ACAC even suggests that Molecular Partners did not sincerely believe any of these opinions when made. Thus, Statements 1, 2, and 3 are inactionable opinions.

Statements 1, 2, and 3 also constitute corporate puffery. Where statements "make[] no specific claims on which reasonable persons can rely," courts have repeatedly held them to be inactionable as a matter of law. *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 (S.D.N.Y. 2011); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."). That same logic applies here, as Statements 1-3 offer investors no specific claims about what *will* happen with MP0310 going forward, but rather explain generally what Defendants' expectations were at the time of the IPO. Courts recognize that similar, non-specific statements of corporate optimism are inactionable as a matter of law. *See, e.g.*, *In re Aratana*, 315 F. Supp. at 757-58 (statement that

21

company had "made remarkable progress towards our stated goal of advancing our expanding pipeline towards commercialization" and company was "proud" to be "on track to have these products reach the market in 2016" were inactionable); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9-10 (S.D.N.Y. Sept. 14, 2015) (statements "stat[ing] that the [FDA approval] process was 'on track' and making continued 'progress,'" were inactionable); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *14 (N.D. Cal. July 21, 2020) ("Statements classifying Pivotal's products and business as 'uniquely position[ed],' 'strong across sectors,' 'best-in-class,' and 'industry-leading' are not actionable . . . .").

Plaintiff's claims as to Statements 1, 2, and 3 should be dismissed for these reasons as well.

## IV.   STATEMENTS 2, 4, AND 6 ARE FORWARD-LOOKING STATEMENTS

Forward-looking statements in a registration statement are immaterial as a matter of law where no "reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *accord Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010). Here, the ample cautionary language in the Registration Statement renders each of Statements 2, 4 and 6—all of which express Defendants' forecasts or expectations for the future—inactionable forward-looking statements protected by the bespeaks caution doctrine. The explicit risk disclosures throughout the Registration Statement, which warned investors about the precise risks Plaintiff claims later materialized, renders each of these statements inactionable. (*See supra* Section IV.)

Statement 2 relates to Molecular Partners' expectations for the MP0310 clinical trials, informing investors the company "expect[ed] that the ongoing Phase 1 clinical trial of AMG 506 (MP0310), should it demonstrate sustained activity of 4-1BB, will produce data in 2021 to inform

22

potential combination studies which would be conducted by Amgen assets." (¶ 36.)  Statement 4 similarly reflected Molecular Partners' expectations regarding the development of MP0310 under the Agreement, telling investors that the Company "will conduct the Phase 1a clinical trials and Amgen will be responsible for all subsequent development of MP0310 / AMG 506 after completion of the Phase 1a clinical trials." (¶ 38.)  But while Plaintiff claims these Statements are misleading because of a failure to disclose competition in the oncology field and the potential impact of Molecular Partners' expiring patents on the Amgen Agreement, that theory ignores that the Registration Statement informed investors of these precise risks.  *See Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007) (noting that "[i]n assessing whether statements provided in the prospectus are materially misleading, the prospectus must be read as a whole, not selectively or in a piecemeal fashion" and granting motion to dismiss where language in the prospectus addressed allegedly omitted risks).

Indeed, the Registration Statement explicitly disclosed that "***[c]ompetition in the oncology space is intense***," noting in particular that MP0310 would, "if approved, . . . compete with agents that are currently in development including monoclonal antibodies, or mAbs, and other small molecule approaches" like Roche's. (Ex. 1 at 166.)  Molecular Partners did not hide the fact that competitors could or would develop "technologies and products that are equally or more effective . . . as any of [Molecular Partners'] current or future technology or product." (*Id.* at 25.)  Moreover, the Registration Statement also made clear that the Amgen Agreement could be terminated, which would impact MP0310's development. (*Id.* at 46 (warning that "a collaborative partner may decide not to pursue, or discontinue the collaborative development of, our product candidates").)  Given these clear and direct disclosures, no reasonable investor could be misled by Statements 2 or 4. *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *9 (S.D.N.Y. Jan.

23

17, 2013) (where offering documents provide cautionary language on materialized risks, "it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency).

Statement 6, which outlines Molecular Partners' expectations regarding the use of proceeds from the IPO, is even more straightforward.  Plaintiff contends that Statement 6 is misleading because it "omitted that [because] the Amgen Agreement [was] in jeopardy" there was a "material likelihood that Molecular Partners would be forced to instead use the proceeds of the IPO for the development of MP0310."  (¶ 43.)  But the Registration Statement warned investors of this exact scenario, explaining that if the Company's "licenses terminate with our licensees, it may be **_necessary for us to assume responsibility at our own expense for the development of the applicable product candidates_**," which would "materially adversely affect our business."  (Ex. 1 at 49; *see also id.* at 46 ("[O]ur anticipated payments under any partnership agreement (e.g., royalty payments for licensed products) may not materialize."); *cf. id.* at 68 ("Our board of directors will have broad discretion in the application of the net proceeds from this offering and could spend the proceeds in ways that do not improve our results of operations or enhance the value of the ADSs.").)

Because these risk factors precisely cover Statements 2, 4, and 6, as well as Plaintiff's theory as to why they were false and/or misleading, each constitutes an inactionable forward-looking statement.  Plaintiff's Section 11 claim should be dismissed accordingly.

***

The ACAC fails to plead any materially false or misleading statement, lacks nonconclusory allegations of falsity, and erroneously claims that Defendants omitted information that was actually disclosed in the Registration Statement and available to the public.  The Court should therefore dismiss Count I in its entirety.

## V.    PLAINTIFF FAILS TO PLEAD A SECTION 15 CLAIM

"To establish § 15 liability, a plaintiff must show a primary violation of § 11 and control of the primary violator by defendants." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).  "Accordingly, the failure of the Section 11 claim establishes *a fortiori* the failure of the Section 15 claim . . . ." *Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 415 (S.D.N.Y. 2020).  Because Plaintiffs have failed to plead a predicate violation, their Section 15 claim must also fail.  *Rombach*, 355 F.3d at 177-78 (finding Section 15 claim "must also be dismissed" when primary securities claims are dismissed).

## CONCLUSION

Plaintiff has failed to allege a primary claim under Section 11 of the Securities Act, and consequently fails to allege a secondary claim under Section 15 of the Securities Act.  As such, the Court should grant Defendants' motion to dismiss and dismiss the ACAC with prejudice.


 Date:   July 24, 2023

Respectfully submitted,

COOLEY LLP

*/s/ Brian M. French*

Brian M. French

Brian M. French
55 Hudson Yards
New York, NY  10001
Tel: (212) 479-6000
bfrench@cooley.com

Koji Fukumura (*pro hac vice* forthcoming)
10265 Science Center Drive
San Diego, CA  92121
Tel: (858) 550-6000
kfukumura@cooley.com

Luke T. Cadigan (*pro hac vice* forthcoming)
Elizabeth M. Wright (*pro hac vice* forthcoming)
Zachary Sisko (*pro hac vice* forthcoming)
500 Boylston Street, 14th Floor
Boston, MA  02116
Tel: (617) 937-23000
Email: lcadigan@cooley.com
        ewright@cooley.com
        zsisko@cooley.com

*Attorneys for Defendants*

26