UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES MERRITT, *individually and on behalf of all others similarly situated*,

                                   Plaintiffs,

                    -against-

MOLECULAR PARTNERS AG, et al.,

                                   Defendants.

---

22-cv-5925 (AS)

MEMORANDUM OPINION
AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Plaintiff James Merritt alleges that defendant Molecular Partners' registration statement misled investors by discussing a partnership for the development of a cancer treatment without disclosing that a competitor had a similar treatment that was further along. But Merritt fails to show that the omission of this information rendered existing statements misleading, especially considering the registration statement's disclosures about "intense" competition in the company's drug development efforts and "significant competition" in oncology specifically. *See* Dkt. 23-1 at 8, 166. As such, defendants' motion to dismiss is GRANTED.

## BACKGROUND

Molecular Partners is a biopharmaceutical company. Am. Compl., Dkt. 18 ¶ 24. In December 2018, it entered into a licensing agreement with Amgen for the clinical development and commercialization of an oncology product, MP0310, for the treatment of fibroblast activation protein (FAP) positive cancers. ¶¶ 27, 29.

In 2021, Molecular Partners went public. ¶ 25. At the time, Molecular Partners and Amgen were conducting a Phase 1 clinical trial for MP0310. ¶ 27. The registration statement discussed MP0310, the Amgen licensing agreement, and the trial. *Id.*

On April 26, 2022, Molecular Partners announced that Amgen had terminated the MP0310 licensing agreement. ¶ 45. The next day, the company's shares fell 37.37%. ¶ 46.

Merritt now sues on behalf of a class of shareholders who purchased Molecular Partners shares pursuant or traceable to its registration statement. ¶ 1. He brings claims under §§ 11 and 15 of the Securities Act based on the registration statement's allegedly misleading statements and omissions. ¶¶ 53–65. The § 11 claim is brought against the company and the officers and directors who signed (or authorized the signing of) the registration statement. The § 15 claim is brought against just the officers and directors. This opinion refers to the defendants collectively as "Molecular Partners."

Merritt identifies six allegedly actionable statements, which can be grouped into three categories:

1.  Statements about MP0310 and the Amgen partnership:

    **Statement 1:** "We believe our partnership with Amgen allows for a meaningful investigation of combination therapies, given Amgen's expertise in the field of oncology. ¶ 36 (alterations omitted).

    **Statement 3:** "We believe AMG 506 (MP0310) could be particularly relevant as a combination agent with potential combination studies in collaboration with Amgen." *Id.*

2.  Statements describing the terms of the Amgen agreement:

    **Statement 4:** "Under the Amgen Agreement, we and Amgen will jointly evaluate MP0310 / AMG 506 in combination with Amgen's oncology pipeline products, including its investigational BiTE molecules. In accordance with a mutually agreed development plan, we will conduct the Phase 1a clinical trials and Amgen will be responsible for all subsequent development of MP0310 / AMG 506 after completion of the Phase 1a clinical trials. We and Amgen have established a joint steering committee to oversee the research, information sharing, and potential amendments of the research plan. Each party is responsible for development costs incurred by it until the beginning of Phase 2 clinical trial, after which point the parties will each contribute a fixed percentage of the development costs on the first three indications. Amgen is required to use commercially reasonable efforts to develop MP0310 / AMG 506 in combination with at least one of Amgen's oncology pipeline products in certain major markets." ¶ 38.

    **Statement 5:** "The Amgen Agreement expires on a country-by-country basis upon the expiration of Amgen's payment obligations in such country. Amgen may terminate the Amgen Agreement in its entirety for convenience following a certain notice period. Either party may terminate the Amgen Agreement upon an uncured material breach of the agreement or insolvency of the other party following a certain notice period. Following any termination, we have certain rights to receive a license to certain intellectual property generated by Amgen under the Amgen Agreement for purposes of continued development and commercialization of MP0310 / AMG 506." ¶ 40.

3.  Statements describing expectations for MP0310 and the IPO proceeds:

    **Statement 2:** "We expect that the ongoing Phase 1 clinical trial of AMG 506 (MP0310), should it demonstrate sustained activity of 4-1BB, will produce data in 2021 to inform potential combination studies which would be conducted by Amgen assets." ¶ 36 (alternations omitted).

    **Statement 6:** "We currently intend to use the net proceeds from this offering, together with our existing cash and cash equivalents, to fund our planned Phase 1 clinical trial of MP0317, to advance the expansion of our research and development activities in our infectious disease program, which is expected to include the selection of an additional product candidate targeting infectious disease and the

preclinical research and initiation of IND-enabling studies with respect to this product candidate, to advance our liquid tumor portfolio initially in acute myeloid leukemia through Phase 1 clinical development, and leveraging our CD3 platform to develop additional product candidates thereafter, to advance our platform and other potential product candidates and for working capital and other general corporate purposes.

….

We currently expect to use the net proceeds from this offering, together with our existing cash and cash equivalents, as follows:

- approximately $25 (CHF 22) million to fund our planned Phase 1 clinical trial for MP0317, the second product candidate in our oncology program, to completion;

- approximately $40 (CHF 36) million towards the expansion of our research and development activities in our infectious disease program, which is expected to include the selection of an additional product candidate targeting infectious disease and the preclinical research and initiation of IND-enabling studies with respect to this product candidate;

- approximately $43 (CHF 39) million to advance our liquid tumor portfolio initially in acute myeloid leukemia, or AML, through Phase 1 clinical development, and leveraging our CD3 platform to develop additional product candidates thereafter; and

- the remainder to fund the advancement of our platform and other potential product candidates, working capital and other general corporate purposes." ¶ 42.

All six statements were misleading, in Merritt's view, for the same basic reason: they "omitted that the value of the Amgen Agreement to Amgen had changed, materially increasing the likelihood of [Amgen's] termination of the Amgen Agreement." ¶ 37. According to Merritt, three of the four patents Molecular Partners had licensed from the University of Zurich were "about to expire." *Id.* And Amgen's competitor, Roche, had begun "enrolling patients in trials for two of its own drug candidates for the treatment of FAP-positive solid tumors, which were each further along and larger than the trial of MP0310." *Id.* Roche also had another trial in progress for a third drug candidate. *Id.* "[T]his increasing competition materially impacted Amgen's strategy concerning drug candidates for FAP positive tumors, devaluing MP0310 to Amgen and undermining Amgen's partnership with Molecular Partners." ¶ 4. "[W]ith the Amgen Agreement in jeopardy," ¶ 43, it was misleading for Molecular Partners to (1) tout the agreement, (2) describe its potential termination as hypothetical, and (3) discuss using the IPO proceeds for other projects when the agreement's termination meant those proceeds would have to be used for MP0310 instead, *see* ¶¶ 37, 41, 43.

Molecular Partners now moves to dismiss. For the following reasons, the motion is GRANTED.

**LEGAL STANDARDS**

Molecular Partners does not argue that the pleadings in this case are subject to the heightened particularity requirements of Rule 9(b). As such, "notice pleading supported by facially plausible factual allegations is all that is required." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). On a motion to dismiss, the Court "must examine the complaint for 'facial plausibility,' considering whether the 'factual content' 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley*, 592 F.3d at 358. "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security … ; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Id.* at 358–59 (quoting 15 U.S.C. § 77k(a)). For § 11 claims, the plaintiff "need not allege scienter, reliance, or loss causation." *Id.* at 359. "To establish § 15 liability, a plaintiff must show a primary violation of § 11 and control of the primary violator by defendants." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (internal quotation marks and citations omitted).

**DISCUSSION**

Molecular Partners argues that the § 11 claim must be dismissed because (among other reasons) the allegedly omitted facts were disclosed, the complaint fails to allege facts demonstrating that any statement was false or misleading, and the statements are not actionable opinions or forward-looking statements.[1] Because the § 11 claim fails, Molecular Partners says the § 15 claim must fail too.

**I.   One of the allegedly omitted facts was disclosed.**

Merritt does not allege that any fact in the registration statement was literally false. Instead, he says that the statement was misleading because two facts were omitted: (1) that various patents licensed to Molecular Partners were about to expire, and (2) that Roche had trials for drug candidates to treat FAP positive tumors that were further along than MP0310.

But the first fact wasn't omitted, as Molecular Partners points out; the registration statement repeatedly disclosed that the relevant patents were nearing expiration. *See* Dkt. 23-1 at 56 ("The base patents … will expire in September 2021, except that one U.S. patent under the license agreement will expire in 2023."); *id.* at 96 ("The primary patents under this license agreement will

---

[1] Molecular Partners also argues that the complaint should be dismissed because it is improperly puzzle pled. The Court need not reach this argument, as there are more fundamental issues with the complaint.

expire in September 2021 ….”); *id.* at 146–47.[2] The registration statement also warned that the patents' expiration could mean “increased competition.” *Id.* at 147. So there can be no liability based on this alleged omission.

The second fact—that two Roche trials were further along and larger than MP0310—was not specifically disclosed in the registration statement. But according to Molecular Partners, it was “readily accessible in the public domain” and so didn't require disclosure. Dkt. 22 at 18 (quoting *In re Keyspan Corp. Sec. Litig.*, 383 F.Supp.2d 358, 377 (S.D.N.Y. 2003)). After all, information on the Roche trials was available at clinicaltrials.gov and in public analyst reports. *See* Dkts. 23-8 to -10; 36-1 at 2; 36-2 at 2.

Still, Merritt's claims cannot be dismissed on that basis. The Second Circuit has warned of the “serious limitations on a corporation's ability to charge its stockholders with knowledge of [omitted] information … on the basis that the information is public knowledge and otherwise available to them.” *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (citation omitted). Though a corporation may be able to charge stockholders with knowledge of information that is “widely known,” it cannot do so for information that is “merely available.” *Id.* at 127 n.12; *see id.* at 127 (finding that *New York Times* and *Forbes* articles were “sporadic news reports” insufficient to “clarify or contextualize the alleged misstatements”). At this stage, the Court is unable to determine whether information on the Roche trials was “widely known” rather than “merely available,” so dismissal on this basis is improper. *Id.* at 127 n.12.

## II.   Merritt fails to allege facts showing that omission of the Roche trials made existing disclosures misleading.

An omission does not automatically trigger liability. “[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.” *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). But an omission is actionable when the omitted information is “necessary to prevent existing disclosures from being misleading.” *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360. Merritt says the omission of the Roche trials is actionable because it made six existing disclosures misleading. The Court disagrees.

At the outset, it is worth noting that this case is similar to *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), which also dealt with alleged omissions. There, the plaintiffs sued Sanofi[3] after the FDA refused to approve its drug, Lemtrada, by a specified date. *Id.* at 208. Some of the physicians

---

[2] It is appropriate to consider the full registration statement, as it is “both integral to the Complaint and subject to judicial notice.” *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 223 (S.D.N.Y. 2023). Merritt does not argue otherwise.

[3] The plaintiffs also sued Genzyme, which was then acquired by Sanofi. To simplify things here, this opinion refers to Sanofi alone.

who reviewed Sanofi's application for FDA approval expressed concerns about Sanofi's failure to use double-blind studies. *Id.* at 206–07. And as it turned out, the FDA had "repeatedly expressed concern with Sanofi's use of single-blind studies [for Lemtrada] and had encouraged Sanofi to use double-blind studies," though it did leave open the possibility of approval if the trials revealed an "extremely large effect." *Id.* at 202, 204. Plaintiffs alleged that Sanofi misled investors by saying (among other things) that it expected that the FDA would approve Lemtrada by the specified date without disclosing that the FDA had actually expressed concerns about the Lemtrada trials. *Id.* at 211.

The district court dismissed the claims, and the Second Circuit affirmed. *Id.* at 208, 214. The Second Circuit explained that there was no "serious conflict" between the FDA's warnings and Sanofi's statements expressing optimism about Lemtrada's approval by the specified date. *Id.* at 212. Sanofi "need not have disclosed the FDA feedback merely because it tended to cut against their projections—Plaintiffs were not entitled to so much information as might have been desired to make their own determination about the likelihood of FDA approval by a particular date." *Id.*

As in *Tongue*, the heart of the complaint here is that Molecular Partners' registration statement reflected an expectation that proved mistaken: that the Amgen agreement would not be terminated anytime soon. Like the *Tongue* plaintiffs, Merritt seeks to hold Molecular Partners liable for failing to disclose evidence that Merritt says cut against this expectation: the fact that Roche had trials that were now further along and larger than the trial for MP0310. But as in *Tongue* (and as will be spelled out in more detail below), Merritt fails to allege facts showing a "serious conflict" between Molecular Partners' expectations regarding the Amgen agreement and Roche's progress. *Id.* In fact, the complaint here does not even allege that the Roche trials were the reason Molecular Partners' expectations about the Amgen agreement were frustrated, making these allegations even weaker than those in *Tongue*. *Cf. id.* at 206–07 (explaining that the physicians reviewing Lemtrada's FDA application "referenced the failure to use double-blind studies"). Without facts showing a significant clash between Molecular Partners' expectations and Roche's progress, Merritt's case cannot go forward.

## A. The opinion statements implied nothing about the Amgen agreement or Roche trials.

The first category of statements consists of two opinions about MP0310 and the Amgen partnership: they discuss Molecular Partners' "belie[f]" that the Amgen partnership "allows for a meaningful investigation of combination therapies, given Amgen's expertise in the field of oncology" and that MP0310 "could be particularly relevant as a combination agent with potential combination studies in collaboration with Amgen." Am. Compl. ¶ 36.[4]

---

[4] Merritt's brief initially purports to challenge that these are opinion statements. *See* Dkt. 33 at 14. But he then cites the standard for when an opinion statement can be misleading from *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). *See* Dkt. 33 at 14. So the Court understands Merritt's argument to be that these statements did not "fairly align[] with the information in [Molecular

"The standard for opinion liability presents 'no small task for an investor' seeking to plead that an opinion is misleading." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 171 (2d Cir. 2023) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)). The investor must allege that the defendant "disbelieved the opinion at the time it was made," that the opinion contained "embedded factual statements that can be proven false," or, as relevant here, that the "opinion, without providing critical context, implied facts that can be proven false." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). Opinions (like factual statements) must be considered "in light of all [the] surrounding text, including hedges, disclaimers, and apparently conflicting information," as well as the "customs and practices of the relevant industry." *Omnicare*, 575 U.S. at 190. In sum, to state a claim based on a misleading opinion, Merritt "must identify particular (and material) facts going to the basis for the issuer's opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.

Merritt suggests that these opinions about the Amgen agreement implied facts about the risk that the agreement would be terminated. The Court disagrees. The first opinion focuses on Amgen's value as a partner. *See* Am. Compl. ¶ 36. It might imply certain facts about Amgen's experience in oncology. But it does not imply any fact about the risk that the Amgen partnership would one day end, especially considering the "surrounding text," *Omnicare*, 575 U.S. at 190, which clarified that the agreement could be terminated "in its entirety" at Amgen's "convenience," Dkt. 23-1 at 151. The same goes for the second opinion, which focuses on MP0310's potential use as a combination agent in studies with Amgen. *See* Am. Compl. ¶ 36. That opinion might imply certain facts about MP0310's ability to be used with other therapies. It might also imply that there were discussions between Amgen and Molecular Partners about collaborating on "combination studies"; if there were no such talks, then discussion of "potential" studies could be misleading. *Id.* But this statement does not imply any fact about the risk that the Amgen agreement would eventually be terminated, especially considering the termination disclosure.

To the extent Merritt suggests instead that the opinions implied facts about the Roche trials, he is incorrect. These opinions focus on MP0310 and its potential as a combination agent. They imply nothing about MP0310's progress relative to other candidates or about Roche's candidates specifically. In other words, the "particular" fact Merritt has identified—the status of Roche's

---

Partners'] possession at the time," not that these were factual statements. *Omnicare*, 575 U.S. at 188–89. In any event, these two statements about Molecular Partners' "belief[s]" clearly fall under the Second Circuit's definition of opinions. *See New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 169–70 (2d Cir. 2023) (distinguishing a fact from an opinion). Molecular Partners characterizes Statement 2, which discusses the company's expectation that data would be produced in 2021, as both an opinion statement and a forward-looking statement. Because Statement 2 deals with the company's expectations for the future, the Court will construe it as a forward-looking statement for purposes of the present motion.

trials—does not "go[] to the basis" for these opinions. *Omnicare*, 575 U.S. at 194. Molecular Partners' opinion about Amgen's value as a partner and MP0310's relevance as a combination agent can "be squared" with the fact that Amgen's competitor had trials for a similar treatment that were further along and larger. *Id.* at 191. Plus, the registration statement discloses that "[c]ompetition in the oncology space is intense" and that Molecular Partners "face[s] significant competition for [its] drug discovery and development efforts." Dkt. 23-1 at 8, 166. Whether read in isolation or in context, these opinions imply nothing about MP0310's success relative to the competition or the Roche trials specifically and thus cannot be a basis for liability.

### B. Merritt fails to allege facts showing that discussing the Amgen agreement's terms without mentioning Roche's progress was misleading.

The second category of statements concerns the terms of the Amgen agreement, including the planned trials and that the agreement could be terminated at Amgen's convenience. Merritt argues that it was misleading to discuss the agreement and its theoretical termination without mentioning that the agreement was in jeopardy because of the Roche trials. In support, he cites *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013), which held that a "corporation has a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success." *Id.* at *13.

In that case, Hi-Crush had touted its contract with a major customer in its registration statement. *Id.* at *2. A month later, the customer purported to repudiate the contract. *Id.* at *3. The court held that the registration statement was not misleading because at the time it became effective, Hi-Crush did not have "any reason to think that [the customer] would attempt to repudiate the agreement." *Id.* at *11. But later statements touting the agreement were potentially misleading because they were made *after* the customer purported to repudiate the agreement. *Id.* at *13. Although the purported repudiation was likely invalid, the court found that it nonetheless undercut Hi-Crush's statements "that it could count on future sales" to that customer. *Id.* at *15–16.

The analogy breaks down because the complaint fails to plausibly allege that the Amgen agreement was in fact in jeopardy at the time the registration statement became effective. Unlike in *Hi-Crush*, there is no allegation that Amgen purported to repudiate the agreement or expressed any uncertainty about it before the registration statement became effective. Instead, the only facts alleged in the complaint are that (1) at the time of Molecular Partners' IPO, three Roche trials had commenced, and two of them were further along and larger than the MP0310 trial, and (2) Amgen terminated the agreement about a year later. Am. Compl. ¶¶ 37, 45.[5] The complaint does not even

---

[5] To support the conclusion that the Amgen agreement was in jeopardy, Merritt also points to the fact that three of Molecular Partners' patents were about to expire. Am. Compl. ¶ 4. But as discussed, the registration statement disclosed this fact and warned that it could spell increased competition. Nothing required Molecular Partners to speculate about how the impending expiration affected Amgen in particular. And in

8

connect the two. It does not allege that the agreement was terminated *because of* the Roche trials. ¶ 45. Nor does timing alone support such an inference. According to the complaint, Amgen did not terminate the agreement for a year *after* it became clear that Roche was ahead. *Compare* ¶ 37 (Roche began enrolling patients in April 2021), *with* ¶ 45 (Molecular Partners announced termination of the Amgen Agreement on April 26, 2022). And without more, the allegation that Roche had trials that were further along does not support the conclusion that the Amgen agreement was in jeopardy. There is no allegation in the complaint that when Amgen signed the agreement with Molecular Partners, there was no competition from other pharmaceutical companies. And even once it allegedly became clear that Roche was ahead, Amgen did not terminate the agreement for another year.

Plus, the registration statement discloses that "Amgen may terminate the Amgen Agreement in its entirety for convenience," ¶ 40; that Molecular Partners "face[s] significant competition for [its] drug discovery and development efforts," Dkt. 23-1 at 8; and that there is "intense competition" in oncology, *id.* at 166; *see also id.* at 47 ("a collaborative partner may decide not to pursue, or discontinue the collaborative development of, our product candidates"). Merritt says that the disclosure about competition is itself misleading, picking out one statement that focuses on the competition MP0310 would face post-approval: "If approved, … MP0310 … would compete with agents that are currently in development including monoclonal antibodies, or mAbs, and other small molecule approaches." *Id.* at 166. But the statement itself makes clear that other agents *were* currently in development. And in any event, the registration statement separately warns of the "significant competition" Molecular Partners faces in its "drug discovery and development efforts." *Id.* at 25.

Considering those disclosures, the second category of statements could be misleading only if there was something unique about the threat from Roche that was not captured by "significant competition." For example, "significant competition" might not cut it if the Roche candidates had just won FDA approval. But all that is alleged in the complaint is that Roche, an Amgen competitor, had two trials for drug candidates to treat FAP positive tumors that were now "larger and further along than Molecular Partners' Phase 1 clinical trial of MP0310," and that Roche had a third trial for another drug candidate. Am. Compl. ¶ 4. As such, the complaint fails to allege anything other than what the registration statement already disclosed: "significant competition." *Cf. Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 794 (S.D.N.Y. 1997) (finding that failure to disclose competitors' aggressive marketing campaign, which was affecting demand for issuers' product, was not misleading "as a matter of law" because prospectus "clearly and unequivocally warned investors that the CO detector business is highly competitive").

---

any event, it is implausible to think that Amgen was unaware of the patents' expiration. Nor does the complaint allege that Amgen terminated the agreement because of the patents' expiration. ¶ 45.

### C. Merritt fails to allege facts showing that the forward-looking statements were misleading alone or in context.

The final category consists of forward-looking statements that describe Molecular Partners' expectations for MP0310 and the IPO proceeds. "[C]ourts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks-caution doctrine," which is a "corollary of the well-established principle that a statement or omission must be considered in context." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020) (quoting *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010)). "A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Id.* (quoting *Iowa Pub.*, 620 F.3d at 141). Such is the case here.

The first forward-looking statement describes Molecular Partners' "expect[ation] that the ongoing Phase 1 clinical trial of [MP0310], should it demonstrate sustained activity of 4-1BB, will produce data in 2021 to inform potential combination studies which would be conducted by Amgen assets." ¶ 36. First off, Merritt has not identified any facts showing that this expectation was frustrated. Though it appears that the "potential combination studies" never took place, the studies were conditioned on MP0310 "demonstrat[ing] sustained activity of 4-1BB." *Id.* Merritt fails to plead that this condition was satisfied. In any event and as discussed, the registration statement has sufficient cautionary language, warning both of competition and the fact that Amgen could terminate the agreement for convenience. *See, e.g.*, ¶ 40; Dkt. 23-1 at 25, 47, 166.

The second forward-looking statement says that Molecular Partners "currently expect[s] to use the net proceeds from this offering … to fund our planned Phase 1 clinical trial of MP0317 …," among other things. Am. Compl. ¶ 42. Merritt says that this statement was misleading because "with the Amgen Agreement in jeopardy, there was a material likelihood that Molecular Partners would be forced to instead use IPO proceeds for the development of MP0310." ¶ 43.

Once again, the complaint fails to allege any facts showing that this statement was misleading. For one thing, the complaint does not even allege that Molecular Partners used the IPO proceeds differently from how the registration statement suggests. And even if it did, the complaint alleges no facts suggesting that Molecular Partners knew that it would do so at the time of the registration statement. As explained above, no alleged facts support that Molecular Partners knew the Amgen agreement was in jeopardy, or even that the agreement was in fact in jeopardy at the time of the IPO. Indeed, in his brief, Merritt seemingly concedes that Molecular Partners may not have known that Roche's progress threatened the Amgen agreement, writing that "Amgen's assessment of the value of the Amgen Agreement may *or may not have been* within Defendants' knowledge." Dkt. 33 at 11 (emphasis added).

Citing no authority, Merritt instead asserts that the "Registration Statement was required to disclose relevant information concerning the market for MP0310 so that investors could make their *own* informed assessment about the risk of the discontinuation of the Amgen Agreement." Dkt. 33 at 12. But no such requirement exists; there is no requirement to disclose information just because

10

investors "would have been interested in knowing about [it], and perhaps would have acted otherwise had [it] been disclosed." *Tongue*, 816 F.3d at 212. Where there is no affirmative disclosure obligation, an omission is actionable only if the information "is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360.

And even if Molecular Partners had reason to worry about the Amgen agreement and thus, its plan for the IPO proceeds, this alone would not trigger a duty to disclose the Roche trials. Insofar as this statement reflects an opinion about the success of the Amgen partnership, such statements are "not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189–90. Merritt fails to allege facts supporting the inference that the Roche trials were the sort of fact that "cannot be squared" with Molecular Partners' opinion that it could use the IPO proceeds in the described manner. *Id.* at 191.

This is especially true given the cautionary language. The registration statement disclosed significant competition, the risk that partnerships could be terminated for any reason, and the risk that if a partnership was terminated, "it may be necessary for [Molecular Partners] to assume responsibility at our own expense for the development of the applicable product candidates." Dkt. 23-1. The Court can imagine circumstances under which this cautionary language would not suffice. But those alleged here—that Roche had trials that were now further along and larger than MP0310's—fall short.

## CONCLUSION

In sum, because Merritt fails to allege facts showing that the omission of information about the Roche trials rendered any existing disclosure misleading, his § 11 claim fails. And "the failure of the Section 11 claim establishes *a fortiori* the failure of the Section 15 claim." *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 415 (S.D.N.Y. 2020). So Merritt's § 15 claim fails too.

Merritt did not request leave to amend in response to Molecular Partners' motion to dismiss, despite this Court's Individual Practices, nor does Merritt now ask for leave to amend or identify how an amendment could address the defects identified in the motion. But the case was transferred to this Court shortly before Merritt's opposition was due, and this is the first motion to dismiss that Merritt's pleadings have faced. So the dismissal will be without prejudice.

Merritt, if he so elects, may file an amended complaint on or before **February 19, 2024**. The amended complaint must be accompanied by a redline against the current complaint. If Merritt elects not to amend, he may file a letter by the same date informing the Court of his election.

The Clerk of Court is directed to terminate Dkt. 21.

SO ORDERED.

Dated: February 5, 2024
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge